## STATE OF CONNECTICUT *v.* NORMAN GAINES
### (SC 16272)

Sullivan, C. J., and Norcott, Palmer, Vertefeuille and Zarella, Js.

Argued April 27—officially released August 28, 2001

*Lisa J. Steele*, special public defender, for the appellant (defendant).

*C. Robert Satti, Jr.*, senior assistant state's attorney, with whom, on the brief, was *Jonathan C. Benedict*, state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Norman Gaines, appeals from the judgment of conviction rendered after a jury found him guilty of capital felony in violation of General Statutes § 53a-54b (8),[1] two counts of murder in violation of General Statutes § 53a-54a[2] and conspiracy to commit murder in violation of General Statutes §§ 53a-

---

[1] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (8) murder of two or more persons at the same time or in the course of a single transaction . . . ."

Although § 53a-54b has been subject to several amendments since 1996, those amendments are not relevant for purposes of this appeal. We, therefore, refer to the current revision of § 53a-54b for convenience.

[2] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

54a and 53a-48.[3] On appeal, the defendant claims that the trial court: (1) lacked jurisdiction over him because the public defender representing him at his probable cause hearing had a conflict of interest, thereby rendering that hearing constitutionally defective; (2) improperly allowed the state to charge him with conspiring with an alleged coconspirator, Ronald Marcellus, who previously had been acquitted of conspiracy charges arising out of the same conduct; (3) improperly allowed the state to present evidence of a conspiracy between him and Marcellus; and (4) improperly failed to instruct the jury that it could not convict him of conspiracy with Marcellus. We reject the defendant's claims and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On October 29, 1996, at approximately 7 p.m., Carl Wright was driving down Maplewood Avenue in Bridgeport between Poplar Street and Howard Street, when two persons crossed the street in front of his car. One of the persons walked to the driver's side of a car parked on the side of the street, and the other person walked to the passenger's side of the car. Both persons then fired multiple gunshots into the parked car. Wright could not identify the race or gender of the shooters because they were wearing hooded sweatshirts, with the hoods pulled over their heads.

Shortly before the shooting, Tyrell Allen had been walking down Maplewood Avenue toward Howard Street and had spoken to Marsha Larose, who also was walking down the street. Larose stopped to speak to someone in a parked car. Allen continued down Maplewood Avenue and turned right onto Howard Street, at

---

[3] General Statutes § 53a-48 provides in relevant part: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy. . . ."

which time he no longer could see Larose or the parked car. Allen then heard approximately twenty gunshots and threw himself to the ground. A short time later, two men ran from the direction of Maplewood Avenue down Howard Street and past Allen. Allen described one of the men as approximately five feet, ten inches tall, light-skinned with a flat nose and medium build and stated that he was wearing an orange or mustard colored hooded sweatshirt. Allen claimed that the other man was wearing a black hooded sweatshirt and was in his twenties.

At some point after the shooting, Officer Wilfred Torres of the Bridgeport police department received a radio call to proceed to Maplewood Avenue in Bridgeport. Upon arrival, he saw a large crowd surrounding the parked car. The body of a woman, later identified as Larose, lay on the ground near the right passenger side of the car. The body of a man, later identified as Gary Louis-Jeune, was slumped over in the driver's seat of the car.

Dan Forcier, a paramedic with American Medical Response, also was called to the scene of the shooting. Upon arrival, he examined Louis-Jeune and Larose and determined that Larose was dead and that Louis-Jeune was barely breathing. Louis-Jeune was taken to St. Vincent's Medical Center in Bridgeport, where he was pronounced dead twenty-two minutes after arrival. Edward T. McDonough, a deputy chief medical examiner in the office of the chief medical examiner of the state of Connecticut, testified at trial that Louis-Jeune died from one or both of two gunshot wounds to his head and that Larose died from one or more of five gunshot wounds to her chest and abdomen.

The Bridgeport police recovered several spent .22 and .45 caliber casings from the scene of the shooting. The medical examiner also recovered several bullets

and bullet fragments from the bodies of the victims. Edward Jachimowicz, a firearms and tool mark examiner with the forensic science laboratory of the Connecticut department of public safety, testified that all of the .22 caliber casings recovered at the scene had been fired from the same gun and that all of the .45 caliber casings had been fired from another gun. He was able to identify several of the bullets recovered from the bodies of the victims as .22 caliber and one of the bullets as .45 caliber. He testified that the .22 caliber bullets most likely were fired from a semi-automatic pistol manufactured by Ruger or Browning.

Leo Charles testified that, at some time before October 31, 1996, he had an encounter with the defendant, Marcellus and "Nunu" Shipman. He did not indicate where the encounter had taken place. During the encounter, Charles gave his car keys to Marcellus, who told him to give the keys to Shipman. Shipman, however, was unable to drive the car because it had a standard shift. Charles then drove the car to his house in order to show Shipman how to operate the shift. During the drive, Charles saw that Shipman had a .45 caliber gun and that the defendant had a .22 caliber Ruger. When they arrived at Charles' house, Charles went inside. Shipman and the defendant then took Charles' car. Forty-five minutes later, Shipman and the defendant returned to Charles' house. Shipman came to the door, threw a black sweatshirt at Charles and told him to keep it.

Torrance McClain testified that, in October, 1996, the defendant lived with him at 31 Laurel Court in Bridgeport. Shortly before October 31 that year, Shipman came to 31 Laurel Court, and McClain gave him a key to the basement of a building there, where a .45 caliber gun and a .22 caliber gun were kept. McClain saw Shipman go into the basement and leave with the guns. McClain then went shopping with Eleanor Figueroa and her chil-

dren. While McClain was shopping, he received a message on his beeper and returned to 31 Laurel Court. When he arrived, the defendant, Shipman and others were there. Shipman asked McClain for a ride to a pay telephone on State Street, which McClain provided. After Shipman made a telephone call, McClain and Shipman drove to the scene of the shooting, where they stayed for approximately five minutes. They then returned to 31 Laurel Court. The defendant was there at that time and told McClain that he "felt good" because "they killed somebody." The defendant told McClain that Shipman had used the .45 caliber gun in the killing and that the defendant had used the .22 caliber gun. At some point, Shipman asked McClain for the key to the basement again and Shipman subsequently returned the guns there.

Figueroa also testified about the day of the shooting. She stated that, in late October, 1996, she was living with her mother-in-law in an apartment at 25 Albion Street in Bridgeport. At some time after 5 p.m., she left the apartment to go shopping with McClain and her three children. After about one and one-half hours, they left the store and headed back to 25 Albion Street. While they were driving, McClain's beeper went off. He dropped her and the children off at 25 Albion Street and left in the car. He returned to 25 Albion Street sometime after midnight.

Figueroa also testified that, at some point in November or December, 1996, she visited the defendant in jail, where he was incarcerated on charges unrelated to this case. The defendant told her at that time that Larose had been killed because she "was in the wrong place at the wrong time," indicating that he could not risk the potential of Larose being a witness to the shooting of Louis-Jeune. The defendant also told her that a .22 caliber gun had been used in the killings. In addition, the defendant told her that he was supposed to be

paid $1500 for the killings, but that he never was paid because he had been incarcerated.

Figueroa further testified that, at some point, the defendant called her from jail and told her to tell Shipman's uncle to dispose of the .22 caliber gun because it had been used in the shooting. She testified that the defendant had made that request on the same day that Marcellus was arrested in connection with the killings, and that the defendant's attitude concerning his involvement in the killings had become more serious after Marcellus' arrest. The defendant also told her that he had disposed of the clothes that he had worn during the shooting.

Figueroa testified during cross-examination that drugs and guns were kept in the basement of the building at 31 Laurel Court, and that she and the defendant sold drugs together at that location. She also testified that she had encouraged the defendant to confess about his involvement in the killings and had told him that she could provide him with the name of a police officer to whom he could "tell . . . what he did for [Marcellus]." During redirect examination, Figueroa testified, without objection, that the defendant and McClain were dealing drugs for Marcellus. During recross-examination, Figueroa testified that McClain was Marcellus' "lieutenant on the block . . . ."[4]

Sergeant James Tyler of the Bridgeport police department testified that he had been in charge of the investigation of the shooting and that, as of February, 1997, his investigation had led him to believe that the defendant and Shipman were active participants in the killings and that Marcellus was an accomplice.

---

[4] A "lieutenant," as that term is used in the context of drug dealing, refers to the person who coordinates the drug sales by giving runners or workers drugs to sell and ultimately receiving the money from the runners or workers after the transaction has occurred.

The defendant testified that, at some point after moving in with McClain and Figueroa in July, 1996, he had begun selling drugs to earn money to pay rent to Figueroa. He testified that Figueroa had given him the drugs and that, after he had sold them, he would give her the money. He also testified that Figueroa was the lieutenant[5] until she moved to 25 Albion Street in late August, 1996, at which time McClain became the lieutenant.

The defendant testified that, in early October, 1996, problems had arisen between him and McClain. The defendant testified that he had been present during a conversation between McClain and Marcellus when McClain told Marcellus that the defendant had given McClain $900 in drug proceeds, when, according to the defendant, he had given McClain $1,000. The defendant told Marcellus that McClain was lying.

The defendant testified that Figueroa had visited him while he was in prison on unrelated charges and repeatedly tried to get him to admit that he was involved in the shooting. The defendant thought that she was joking about his involvement until he learned that Marcellus had been arrested and had signed a statement implicating him, at which time he believed that he would be the next person to be arrested in connection with the killings.

The defendant testified during cross-examination that he had been arrested and jailed twice during the fall of 1996 on charges unrelated to the shooting, and that Marcellus posted a $7500 bail bond each time. During redirect examination, the defendant testified that it was his understanding that Marcellus posted bond for him because, when a drug dealer is arrested, the person whose drugs are being sold posts bond.

---

[5] See footnote 4 of this opinion.

The defendant testified that he did not kill the victims, that no one ever asked him to kill the victims and that he had no reason to kill the victims.

The defendant moved for a judgment of acquittal at the close of the state's case and again at the close of his own case. The trial court denied both motions. The jury returned a verdict of guilty on all counts. The trial court merged the two counts of murder with the capital felony count and sentenced the defendant to life imprisonment without the possibility of release on the capital felony count and to twenty years imprisonment on the conspiracy count, to be served concurrently, for a total effective sentence of life imprisonment without the possibility of release. The defendant appealed to this court pursuant to General Statutes § 51-199 (b) (3).[6] Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that his probable cause hearing was defective because the attorney who represented him at that hearing had a conflict of interest. Specifically, the defendant claims that both he and a key witness for the state were represented by public defenders. The defendant argues that the trial court, therefore, lacked jurisdiction over him and that he is entitled to a new probable cause hearing and a new trial.

The following additional facts and procedural history are relevant to this claim. The defendant's probable cause hearing was held on April 17, 1997, before *Hartmere, J.* At that hearing, the defendant was represented by Preston Tisdale, an assistant public defender.

---

[6] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

McClain was a witness for the state. He testified, under cross-examination by the attorney representing Shipman, one of the defendant's alleged coconspirators, that McClain currently was incarcerated pending the disposition of certain drug charges against him. He also testified that he previously had been represented in connection with those charges by a public defender, Susan Cococcia, and that, recently, he had been appointed a new lawyer, whom he had not yet met.

McClain's recently appointed attorney, Jason Gladstone, was not present in the courtroom when McClain testified on the morning of the hearing, but appeared in the courtroom after the lunch break. Gladstone stated to the court that he had been appointed as McClain's attorney two or three days prior to the hearing, that he had not met McClain prior to the hearing and that he had not been aware that McClain intended to testify at the hearing until the morning of the hearing.

On July 31, 1997, Tisdale, on behalf of the defendant, filed a motion requesting that Timothy Aspinwall be appointed as a special public defender on the ground that the defendant could not be represented by someone in the public defender's office because McClain was represented by the public defender's office. The court, *Ronan, J.*, granted the motion.

On August 26, 1997, Aspinwall filed a motion to withdraw his appearance at the defendant's request. At a hearing on the motion before *Ronan, J.*, the defendant stated that he wanted another special public defender because Aspinwall had advised the defendant that he did not have a strong case and that he should make a deal with the state. Tisdale appeared and explained that someone from the public defender's office could not be appointed because a key witness in the case was represented by the public defender's office. The court denied Aspinwall's motion.

On June 1, 1998, Aspinwall filed another motion to withdraw his appearance. At a hearing on the motion before *Ronan, J.*, on June 10, 1998, Aspinwall stated that an ethical conflict, unrelated to the defendant's claim on appeal, had arisen. The trial court granted the motion on June 11, 1998. On the same day, the court, *Ronan, J.*, granted the defendant's motion requesting the appointment of Alexander Schwartz as a special public defender.

The state, relying on an April 10, 1997 transcript of a hearing in criminal proceedings against McClain, at which McClain requested the appointment of a special public defender because of a conflict of interest within the public defender's office, claims that Gladstone was not a public defender, but, rather, a special public defender.[7] The defendant concedes that his claim concerning the conflict of interest was not preserved at the probable cause hearing, but, nevertheless, seeks review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). Under *Golding*, a defendant can prevail on an unpreserved claim of constitutional error "only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless

---

[7] The defendant filed with this court a motion to strike that transcript as being outside the record in this case. The state then moved this court to take judicial notice of the court file and the judicial proceedings in the criminal case against McClain. We granted the state's motion. Before we granted the state's motion, the defendant filed a memorandum in opposition of the state's motion. In that memorandum, the defendant requested, inter alia, that this court take judicial notice of the court file in a separate criminal proceeding against the defendant in which Cococcia, prior to the probable cause hearing, had represented the defendant. We granted, sua sponte, the defendant's request to take judicial notice. The record does not indicate whether Cococcia was representing the defendant in that proceeding at the time of the probable cause hearing.

error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id., 239–40.

As we discuss more fully later in this opinion, the defendant's claim that his probable cause hearing was defective because the attorney who represented him at that hearing had a conflict of interest raises two issues: (1) whether the court should have inquired, sua sponte, into the existence of a conflict of interest; and (2) whether an actual conflict of interest adversely affected his attorney's performance. With respect to the first issue, we conclude that the first two prongs of *Golding* have been met and, therefore, we may review the defendant's claim with respect to that issue. We conclude, however, that the defendant's claim with respect to the first issue fails under the third prong of *Golding*. With respect to the second issue, we conclude that the record is inadequate for our review.

"The sixth amendment to the United States constitution,[8] as applied to the states through the fourteenth amendment, and article first, § 8, of the Connecticut constitution[9] both guarantee a defendant the right to effective assistance of counsel in a criminal proceeding. *Powell* v. *Alabama*, 287 U.S. 45, 71, 53 S. Ct. 55, 77 L. Ed. 158 (1932); *State* v. *Mason*, 186 Conn. 574, 577, 442 A.2d 1335 (1982). Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest. *Wood* v. *Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981). This right applies not only to the trial itself, but to any critical

---

[8] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."

[9] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . ."

stage of a criminal proceeding. *Holloway* v. *Arkansas*, 435 U.S. 475, 489, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978), citing *White* v. *Maryland*, 373 U.S. 59, 83 S. Ct. 1050, 10 L. Ed. 2d 193 (1963); *Gideon* v. *Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963); *Hamilton* v. *Alabama*, 368 U.S. 52, 82 S. Ct. 157, 7 L. Ed. 2d 114 (1961). Moreover, one of the principal safeguards of this right is the rule announced by this court that [a trial] court must explore the possibility of a conflict . . . when it knows or reasonably should know of a conflict . . . . *State* v. *Martin*, 201 Conn. 74, 79, 513 A.2d 116 (1986), quoting *Festo* v. *Luckart*, 191 Conn. 622, 629, 469 A.2d 1181 (1983). Because this right to conflict free representation applies to all critical stages of a criminal proceeding, the duty of a court to safeguard this right applies equally to all such stages . . . [including] a hearing in probable cause." (Internal quotation marks omitted.) *State* v. *Cruz*, 41 Conn. App. 809, 811–12, 678 A.2d 506, cert. denied, 239 Conn. 908, 682 A.2d 1008 (1996). "[T]he remedy for a defective probable cause hearing is . . . a new probable cause hearing and a new trial." (Internal quotation marks omitted.) *State* v. *White*, 229 Conn. 125, 140, 640 A.2d 572 (1994).

A potential conflict of interest may exist when counsel for the defendant represents, or has represented, a witness for the state. Cf. *State* v. *Jennings*, 216 Conn. 647, 654–56, 583 A.2d 915 (1990) (although defendant claimed conflict when public defender's office previously had represented two witnesses, including victim, no conflict existed when witnesses waived confidentiality of prior representation); *State* v. *Martin*, supra, 201 Conn. 77, 81 (holding that defense counsel's claim of conflict of interest stemming from his representation of both defendant and person identified by state's witness as being involved in case required trial court to make further inquiry).

"There are two circumstances under which a trial court has a duty to inquire with respect to a conflict of interest: (1) when there has been a timely conflict objection at trial; *Holloway* v. *Arkansas*, [supra, 435 U.S. 488]; or (2) when the trial court knows or reasonably should know that a particular conflict exists . . . . *Cuyler* v. *Sullivan*, 446 U.S. 335, 347, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). A trial court's failure to inquire in such circumstances constitutes the basis for reversal of a defendant's conviction. *Holloway* v. *Arkansas*, supra, 488. In the absence of an affirmative duty by the trial court to inquire, however, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his [or her] lawyer's performance in order to obtain reversal of his [or her] conviction." (Internal quotation marks omitted.) *State* v. *Crespo*, 246 Conn. 665, 686, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999). "Before the trial court is charged with a duty to inquire, the evidence of a specific conflict must be sufficient to alert a reasonable trial judge that the defendant's sixth amendment right to effective assistance of counsel is in jeopardy." Id., 697.

"It is firmly established that a trial court is entitled to rely on the silence of the defendant and his attorney, even in the absence of inquiry, when evaluating whether a potential conflict of interest exists. As [the United States Supreme Court] noted in *Cuyler* [v. *Sullivan*, supra, 446 U.S. 346–47] [d]efense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial. Absent *special circumstances*, therefore, trial courts may assume either that [the potentially conflicted] representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist. . . . [T]rial courts necessarily rely in large measure upon the good

faith and good judgment of defense counsel. An attorney [facing a possible conflict] in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest *exists or will probably develop in the course of a trial.*" (Emphasis in original; internal quotation marks omitted.) *State* v. *Crespo*, supra, 246 Conn. 696.

"Almost without exception, we have required that a claim of ineffective assistance of counsel must be raised by way of habeas corpus, rather than by direct appeal, because of the need for a full evidentiary record for such [a] claim." (Internal quotation marks omitted.) Id., 687–88.

The defendant maintains that there was a conflict of interest because both he and McClain were represented at the probable cause hearing by public defenders, namely, Tisdale and Gladstone. The defendant further asserts that there was a conflict, even if it is assumed that Gladstone was a special public defender, because McClain had been represented by Cococcia, a public defender from Tisdale's office, up to the time of hearing. The defendant also claims that, at the time of the probable cause hearing, Cococcia had represented both McClain and the defendant in prior, and, with respect to the defendant's case, possibly ongoing, criminal proceedings unrelated to this case.

We first consider whether the court, *Hartmere, J.*, was required to make an inquiry, sua sponte, with respect to the existence of a potential conflict of interest. The defendant argues that the court had a duty to make such an inquiry at the probable cause hearing because both Tisdale and Gladstone were present at the hearing, and, therefore, it should have been obvious to the court that a conflict of interest existed. He also argues that McClain's identification of Cococcia as his former attorney at the probable cause hearing should

have alerted the court that there was a conflict. Finally, he argues that when, after the probable cause hearing, he requested a special public defender and indicated that he could not be appointed a public defender because a key state witness was represented by a public defender, the court, *Ronan, J.*, should have inquired as to the effect of the potential conflict on earlier proceedings. We disagree.

The defendant first argues that it should have been obvious at the probable cause hearing that the defendant and McClain were represented by public defenders, and that, therefore, the court, *Hartmere, J.*, should have made an inquiry, sua sponte, with respect to the existence of a potential conflict. The defendant has conceded, however, that it is unclear from the record whether Gladstone was a public defender or a special public defender. Thus, the defendant essentially argues that the trial court must have assumed that Gladstone was a public defender and that that assumption should have triggered an inquiry. There is nothing in the record, however, to suggest that the trial court made such an assumption. Indeed, the record indicates only that it was unclear at the time of the hearing whether Gladstone was a special public defender, and that the defendant, himself, failed to make any inquiry or objection concerning a conflict. We cannot conclude that, under such circumstances, "the evidence of a specific conflict [was] sufficient to alert a reasonable trial judge that the defendant's sixth amendment right to effective assistance of counsel [was] in jeopardy." Id., 697.

Nor can we conclude that McClain's mere identification of his *former* attorney, Cococcia, while he was under cross-examination concerning his motivations for testifying at the probable cause hearing[10] was suffi-

---

[10] For example, McClain testified as to his expectations of favorable treatment from the state in the case in which Cococcia previously had represented him.

cient to alert the court that a potential conflict existed. Cf. *State* v. *Cruz*, supra, 41 Conn. App. 812, 816 (finding no potential conflict of interest when defendant's attorney formerly represented state's witness testifying at defendant's probable cause hearing). Again, we note that this testimony did not alert counsel for the defendant that a potential conflict existed.

Moreover, we cannot conclude that when, on July 31, 1997, more than three months after the probable cause hearing, the court, *Ronan, J.*, granted the defendant's motion for the appointment of a special public defender, it had an obligation to inquire into the effects of a potential conflict of interest at the probable cause hearing. In that motion, the defendant stated that he could not be represented by a public defender because McClain, a key witness for the state, was represented by a public defender.[11] The defendant did not advise the court, however, that there had been a probable cause hearing, that McClain had testified at that hearing, or that he believed that a potential conflict had existed at the time of the hearing. Thus, we cannot conclude that the mere filing of a motion requesting the appointment of a special public defender under these circumstances was sufficient to alert the court, *Ronan, J.*, to a potential conflict.

Accordingly, we conclude that "the evidence of a specific conflict [was not] sufficient to alert a reasonable trial judge that the defendant's sixth amendment right to effective assistance of counsel [was] in jeopardy." *State* v. *Crespo*, supra, 246 Conn. 697. Therefore, neither the court, *Hartmere, J.*, nor the court, *Ronan, J.*, had a duty to inquire, sua sponte, with respect to the existence of a potential conflict of interest at the

[11] We note that, inasmuch as it is unclear from the record whether the attorney who represented McClain, namely, Gladstone, was a public defender or a special public defender, it also is unclear whether the defendant's claim was accurate.

time of the probable cause hearing or when the defendant's motion for the appointment of a special public defender was granted. To prevail on his claim, therefore, the defendant must "demonstrate that an actual conflict of interest adversely affected his lawyer's performance . . . ." (Internal quotation marks omitted.) Id., 686. We conclude that the defendant has not done so.

The record does not indicate when McClain was represented by Cococcia, when the defendant was represented by Cococcia, the date on which Gladstone was assigned as McClain's attorney or whether Gladstone was a public defender or a special public defender,[12] all of which are relevant for purposes of establishing the existence of an actual conflict. Nor does the record indicate whether Tisdale explained the potential conflict to the defendant or whether the defendant waived the potential conflict before the hearing. Furthermore, the record does not indicate the reasons for Gladstone's appointment as McClain's attorney before the probable cause hearing or the reasons for Tisdale's request on behalf of the defendant for a special public defender to represent the defendant after the hearing. Finally, the record is silent as to whether, or how, Tisdale's performance at the probable cause hearing adversely was affected by the alleged conflict. Accordingly, we cannot conclude, on the basis of the record before us, that there was an actual conflict of interest or whether defense counsel's performance at the probable cause

---

[12] Although we granted the state's motion to take judicial notice of the April 10, 1997 proceedings in the criminal case against McClain, at which McClain requested the appointment of a special public defender because of a conflict within the public defender's office, we note that this court is not a fact-finding tribunal. Thus, although we can take judicial notice of McClain's request, we cannot infer either that the reason for the request was McClain's expected testimony at the defendant's probable cause hearing or that Gladstone was appointed as a result of that request.

hearing adversely was affected by the existence of such a conflict.

## II

We now consider the defendant's claims concerning the conspiracy charge. The defendant claims that the trial court improperly: (1) allowed the state to charge the defendant with conspiring to commit murder with Marcellus, who previously had been acquitted of conspiracy charges arising out of the same conduct;[13] (2) allowed the state to present evidence of a conspiracy between the defendant and Marcellus;[14] and (3) failed to instruct the jury that it could not convict the defendant of conspiring to commit murder with Marcellus. The defendant concedes that his claim that the trial court improperly instructed the jury was not preserved, but, nevertheless, seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. We reject all three claims.

The following additional facts and procedural history are relevant to the defendant's claims. On November 17, 1999, the state filed an amended information, in which it charged the defendant with, inter alia, conspiring with Shipman and Marcellus to murder Louis-Jeune and Larose. The defendant subsequently filed a motion

[13] The defendant argues that the trial court should have stricken from the information that portion of the conspiracy charge pertaining to Marcellus. We note, however, that the defendant moved to dismiss the entire charge of conspiracy to commit murder, not just the portion of the conspiracy charge pertaining to Marcellus. Nevertheless, we need not decide whether this claim properly was preserved because, as we discuss more fully in the text of this opinion, even if it is assumed that the defendant's claim properly was preserved, the state properly included Marcellus' name in the count charging the defendant with conspiracy to commit murder.

[14] Although the defendant's motion in limine was directed specifically at the admissibility of hearsay testimony concerning statements made by Marcellus, the defendant argues that any evidence concerning the relationship between Marcellus, Shipman and the defendant should have been excluded. He did not identify any hearsay testimony concerning statements made by Marcellus that was improperly admitted.

to dismiss the conspiracy charge on the ground that Marcellus had been acquitted on conspiracy charges arising out of the same alleged criminal activity. The defendant also filed a motion in limine seeking to exclude evidence of third party hearsay statements made by Marcellus. The trial court, *Comerford, J.*, held a hearing on the motions on November 24, 1999. At a hearing on November 29, 1999, the court denied the motion to dismiss and also determined that the issues raised in the motion in limine were evidentiary in nature and should be addressed during the course of the trial. Therefore, it denied the motion in limine without prejudice. During trial, the defendant objected to the admission of some evidence concerning Marcellus' involvement in the events surrounding the killings, but failed to object to the admission of other similar evidence. In addition, the defendant, himself, elicited certain testimony concerning Marcellus' involvement.

After closing arguments, the trial court instructed the jury in relevant part that, to convict the defendant of conspiracy, it must conclude that, "[o]ne, the defendant had the intent to commit the crime of murder, two, that acting with that intent, he agreed with one or more persons to engage in such crime, and three, that either he or any one of the other parties to the agreement committed an overt act in pursuance of that agreement."[15]

---

[15] The following is the full text of the trial court's instruction on conspiratorial liability: "There's one other theory of liability here. That's what's called conspiratorial liability.

"There's a doctrine in our law that provides that, once a defendant's participation in a conspiracy is established, he is responsible for each of the criminal acts of the other coconspirators which is within the scope of and [in] furtherance of the conspiracy. That means in this case that, if you conclude that the defendant is, in fact, guilty of conspiracy to commit murder, as I will define that for you a little bit later, but that he did not, in fact, kill . . . Louis-Jeune or . . . Larose, then . . . you must determine whether sufficient evidence has been provided to show you beyond a reasonable doubt that another member of the same conspiracy, namely . . . Shipman, did, in fact, commit the crime of murder. If Shipman did commit the

crime of murder and if that murder was in the scope and [in] furtherance of the conspiracy of which you have concluded [the defendant] was a member, then the defendant would be guilty of murder as well.

"In summary, if you conclude that the defendant was a member of the conspiracy as charged in the fourth count of this information beyond a reasonable doubt and that . . . Shipman committed the crime of murder, and you further conclude beyond a reasonable doubt that the murder was within the scope and [in] furtherance of the conspiracy, then each and every member of that conspiracy would be guilty of murder whether or not they [sic] personally committed the murder. As to the first three counts of this information charging murder and capital felony, the state does not have to prove beyond a reasonable doubt which shot or shots killed either victim or both. It makes no difference whether . . . Louis-Jeune or . . . Larose's injuries were actually inflicted by the defendant's firing of a gun or another gun if the defendant was engaging with another in a common purpose to commit murder.

* * *

"[In] [t]he final count of the information, the state charges that the defendant is guilty of the crime of conspiracy. The crime of conspiracy, by the way, is a separate crime from the crime which is the object of the conspiracy which, in this case, is murder. The crime of conspiracy consists essentially of an agreement to perform conduct which is, itself, criminal, followed by one or more overt acts in pursuance of that agreement. Section 53a-48a of [the General Statutes] provides as follows. . . . A person is guilty of conspiracy when with intent that conduct constituting a crime be performed he agrees with one or more persons to engage in or cause the performance of such conduct and any one of them commits an overt act in pursuance of such conspiracy. There are, therefore, three elements to this crime as applied in this case: First, an intent to commit the crime of murder, second, an agreement with one or more persons to commit such crime, and third, the commission of an overt act in pursuance of the agreement by any one or more of the persons who made the agreement.

"The first element is that the defendant had the intent to commit the crime of murder as I've just defined that for you. The defendant must be proven to have been actuated by the criminal intent. Please recall and apply here my charge on intent once again, what it means and how you determine it.

"The second element is that the defendant, acting with that criminal intent, agreed with one or more persons to commit the crime of murder. There must then have been an agreement by the defendant with one or more persons to engage in or cause the performance of the crime of murder. The agreement may have been explicit or expressed or it may be implicit or unexpressed. It's sufficient to show that the persons involved were knowingly engaged in a mutual plan to commit murder. It is not necessary that the defendant knew the complete plan of the conspiracy in all its details. It is enough if he knew that an agreement existed and that he was creating an agreement or that he joined with at least one other person into an

We conclude that all three of the defendant's claims are governed by *State* v. *Colon*, 257 Conn. 587, 778 A.2d 875 (2001), which we recently have decided. We previously have held that, in cases involving only two coconspirators, the acquittal of one alleged coconspirator bars the state from prosecuting the remaining coconspirator in a separate trial for the same alleged conspiracy. *State* v. *Robinson*, 213 Conn. 243, 253, 567 A.2d 1173 (1989). The defendant argues that our holding in *Robinson* precludes the state from charging a defendant with conspiring with an alleged coconspirator who has been acquitted, even in cases involving more than two alleged coconspirators. In *Colon*, however, we overruled *Robinson* and concluded that the state may prose-

agreement to commit the crime. Such an agreement, by the way, may be proven by direct evidence, that is, testimony from one of the coconspirators about the agreement, or it may be shown by circumstantial evidence, for conspiracies, by their very nature, are formed in secret and only rarely can be proven by direct evidence as opposed to circumstantial evidence. Thus, a conspiracy may be proven to you by showing a sequence or combination of acts that tend[s] to show mutual purpose.

"The third element is that any one or more of the persons who are parties to the agreement committed an overt act in pursuance or in furtherance of the conspiracy. At least one of the conspirators must have done at least one overt act to further the purpose of the conspiracy. It makes no difference which one did the overt act, nor is it necessary that the defendant, himself, committed the overt act or that all of the conspirators did so. It's sufficient if any one or more of the persons who entered into the illegal agreement committed at least one overt act in furtherance of its purpose. An overt act is one which manifests or shows that it is part of a design or intent. It must be something done after the agreement has been formed which furthers the purpose of the agreement.

"To summarize, in order for you to convict the defendant on this count of the information you must be satisfied beyond a reasonable doubt that the following elements have been proven: one, the defendant had the intent to commit the crime of murder, two, that acting with that intent, he agreed with one or more persons to engage in such crime, and three, that either he or any one of the other parties to the agreement committed an overt act in pursuance of that agreement.

"If you find that the state has proven these elements beyond a reasonable doubt, your verdict would be guilty of this crime of conspiracy. If, however, you do not find that all of the elements of conspiracy are proven beyond a reasonable doubt, your verdict would be not guilty on this count."

cute a defendant for conspiring with an alleged coconspirator who has been acquitted of conspiracy charges arising out of the same alleged conspiracy. *State* v. *Colon*, supra, 600–601. Accordingly, the state was not barred from prosecuting the defendant for conspiring with Marcellus to murder Louis-Jeune and Larose even though Marcellus previously had been acquitted of the charge of conspiracy to commit murder arising out of the same alleged conspiracy.

Having concluded in *Colon* that the state may prosecute a defendant for conspiring with a alleged coconspirator who has been acquitted of conspiracy charges arising out of the same alleged conspiracy, we need not decide whether, under the rule enunciated in *State* v. *Robinson*, supra, 213 Conn. 253, Marcellus' name should have been stricken from the conspiracy count of the amended information. Because, under *Colon,* the jury could have convicted the defendant of conspiring with Marcellus if the state had proven such a conspiracy beyond a reasonable doubt; *State* v. *Colon,* supra, 257 Conn. 601; we conclude that Marcellus properly was identified as an alleged coconspirator. The information "informed the defendant of the charge against him with sufficient precision to enable him to prepare his defense and to avoid prejudicial surprise, and [was] definite enough to enable him to plead his acquittal or conviction in bar of any future prosecution for the same offense, [and thus] performed [its] constitutional [function]." (Internal quotation marks omitted.) *State* v. *Spigarolo*, 210 Conn. 359, 381, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989).

Likewise, we conclude that the evidence concerning Marcellus' involvement in the events surrounding the killings was admissible for purposes of establishing the existence of a conspiracy between the defendant and Marcellus. Accordingly, we need not consider whether the defendant waived his evidentiary claim pertaining

to the admission of testimony concerning Marcellus' involvement by failing to object or, alternatively, by eliciting that testimony himself. Nor need we consider whether that evidence was admissible for purposes of establishing elements of the charged offenses other than the alleged conspiracy with Marcellus.

Finally, we need not consider whether the defendant's claim concerning improper jury instructions is reviewable under *Golding* because, even if we assume that the claim is reviewable, we conclude that the instructions were proper. If the jury found beyond a reasonable doubt that a conspiracy, as properly defined by the trial court in its instructions to the jury, existed between the defendant and Marcellus, it could have convicted the defendant on that ground.[16]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[16] We also note that, even if the evidence of a conspiracy between the defendant and Marcellus was insufficient to support a conspiracy conviction, there was sufficient evidence to support a conviction of conspiring with Shipman to commit murder. "[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." (Internal quotation marks omitted.) *Griffin* v. *United States*, 502 U.S. 46, 56–57, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991).

