## STATE OF CONNECTICUT *v.* CHARLES E. KERR
## (AC 29611)

Bishop, DiPentima and Peters, Js.

---

Argued November 30, 2009—officially released March 30, 2010

*Gary A. Mastronardi*, special public defender, for the appellant (defendant).

*John A. East III*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Herbert E. Carlson, Jr.*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Charles E. Kerr, appeals from the judgment of conviction, following a jury trial, of robbery in the second degree as an accessory in violation of General Statutes §§ 53a-135 (a) (1) and 53a-8, conspiracy to commit robbery in the second degree in violation of General Statutes §§ 53a-135 (a) (1) and 53a-48 (a), larceny in the first degree as an accessory in violation of General Statutes §§ 53a-122 (a) (2) and 53a-8, and conspiracy to commit larceny in the first degree in violation of General Statutes §§ 53a-122 (a) (2) and 53a-48 (a). On appeal, the defendant claims that the trial court improperly permitted hearsay testimony from two state's witnesses. Specifically, the defendant claims that two different police officers testified regarding statements that they attributed to the defendant without any foundational testimony to authenticate that the statements were made by the defendant. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On February 9, 2004, at approximately 11:45 a.m., three African-American men, all wearing blue jeans, dark blue or black "Starter-type" winter jackets or hooded sweatshirts and dark ski masks, robbed the Hamilton Sundstrand Federal Credit Union (credit

union) located in Enfield. Although the trio entered the business when no customers were present, there were four employees working at that time. Upon entering the credit union, two of the men immediately jumped over the counter that separated the teller area from the public. The defendant, the first to enter the credit union, vaulted over the counter and told a teller, Megan Fitzsimons, to "get back" and pushed her away from the counter. Fitzsimons described the defendant's voice as "deep, low, kind of gravelly" and testified that she had never heard a voice like that before. When the defendant pushed Fitzsimons, another credit union employee, Peter Skinner, moved protectively toward Fitzsimons, and the defendant yelled at him to "get back." Skinner, who complied with the defendant's order, testified that the defendant's voice was "extremely gravelly," and "deep and very throaty."

After going over the counter, the defendant rifled through the teller drawer at Fitzsimons' station, removed the money and put it in his pockets. Further down the counter, the second perpetrator, who had also vaulted over the counter, attempted to open a small night deposit vault. When he was unsuccessful, he moved to a teller station, which Fitzsimons told him was empty, and last, he unsuccessfully tried to get money from a teller station on the opposite side of the defendant. The third perpetrator went directly to the main vault. Inside the vault, he pulled on the doors of all the smaller compartments in the vault, trying to find one that would open. He was able to open a vault at the bottom, which contained a cash tray. He grabbed the cash tray, said, "[l]et's go," to the other two perpetrators, and all three exited the credit union. The entire episode was over in less than two minutes. Fitzsimons testified that the cash drawer likely held between $60,000 and $70,000. The credit union later determined that, in total, the robbers took $79,922, which consisted

of bills in two, five, ten, twenty, fifty and one hundred dollar denominations.

After exiting the credit union, the three men drove away in a very dirty, dark colored Ford Escape, with a Rhode Island license plate. Shortly thereafter, the credit union employees called the police and provided descriptions of the perpetrators, and, after reviewing the credit union's surveillance tape, provided a description of the getaway vehicle as well. This vehicle description was broadcast over the radio and received by Mary Buckley, a state police trooper who was patrolling Interstate 91. Soon thereafter, Buckley observed a vehicle matching that description traveling south on Interstate 91. Buckley followed the vehicle south on Interstate 91, onto an exit ramp and into the streets of Hartford. As Buckley continued to follow the vehicle, it suddenly accelerated and sped through a stop sign. Buckley assumed, at that point, that the driver was aware that she was following him and that he was attempting to evade the police. Buckley turned on her vehicle's siren and pursued the Ford Escape but lost sight of it when it turned down a side street. When Buckley turned down that same street, she found that the vehicle had stopped in a driveway and that its occupants were gone.

Officers from the Enfield and Hartford police departments converged on the scene where Buckley found the abandoned vehicle. A K-9 unit joined in the search for the robbers but was unsuccessful in locating them. Fitzsimons was brought to the scene, where she identified the vehicle as the one she had seen the robbers get into when leaving the credit union. In the snow around the vehicle, the police saw several footprints and a single $20 bill. Looking through the windows of the vehicle, the police saw ski masks and what appeared to be a teller's drawer from the bank. The vehicle was towed to police headquarters, where an inventory search was conducted. The search yielded a deep blue

or purple ski mask, a blue knit watch cap, three packets of bundled cash and some loose bills totaling $6059, the metal cash tray taken from the vault and a money band bearing the credit union's markings. It was later determined that the vehicle belonged to Mark "Kiki" Beaufort, who, at approximately 3 p.m. on the day of the robbery, reported his car stolen.

The Bloomfield police department was already familiar with Beaufort. Nearly eighteen days prior to the robbery, Danny Rhodes, a recidivist felon, was arrested on a charge of burglary. In an effort to mitigate the case against him, Rhodes indicated that he had information about a pending criminal conspiracy. Rhodes told Bloomfield police Detective Robert Spellman that "[t]his past Monday I gave Kirk and Buford a ride to the . . . credit union off of exit [forty-nine] [on] [Interstate] 91. Once at the credit union they checked it out, said they liked it and stated they were going to hit it this week. They sent their front girl into the bank today [January 22, 2004] to case the place. They prefer to hit places near the highway for a fast escape."[1]

The day after the robbery of the credit union, Spellman was contacted by Rhodes, who indicated that he had information about the robbery. Spellman contacted the Enfield police department, which sent Detective Thomas Murkowicz and Lieutenant Lawrence Curtis, as well as several other officers, to speak with Rhodes about the robbery. Rhodes indicated that he knew the defendant, had spoken to him recently, and then, based on this conversation, agreed to go to the defendant's apartment, while wearing an electronic monitoring device, to engage him in a conversation regarding the robbery. The monitoring device was equipped with a

[1] After meeting with Rhodes on February 10, 2004, the police were able to determine that the names "Kirk" and "Buford," which were mentioned by Rhodes in his written statement, were actually the defendant and Beaufort.

radio transmitter that would allow the police to hear Rhodes' conversation, as well as a recording device to tape the conversation.[2]

The police surveillance team, which included Murkowicz, Spellman and Curtis, set up in positions near the defendant's second floor apartment at 30 Groton Street, Hartford, and watched Rhodes walk up the sidewalk and into the building. They were unable to see Rhodes once he was inside, but they were able to hear him walk up to the second floor. For approximately the next ninety minutes the police listened over the radio transmitter as Rhodes engaged a "gravelly voiced" man in conversation.[3] Collectively, Murkowicz and Curtis heard the man say that he was afraid he might have left his fingerprints at the bank or on the cash tray, that the getaway vehicle had to be abandoned and that he and the other perpetrators ran from the vehicle through some backyards. They also heard the man say that some of the money had been left in the vehicle and dropped on the ground and that he had gone back to the location where they had abandoned the getaway vehicle to look for it but was unsuccessful. Additionally, Murkowicz and Curtis heard the man tell Rhodes that he used some of the proceeds of the robbery to purchase a microwave, that he had to pay $18,000 to Beaufort and the third conspirator, "Max," and that Beaufort had purchased jewelry with his share of the ill-gotten proceeds. He also stated that it was Beaufort who had reported the getaway vehicle stolen. Spellman heard the man tell Rhodes that the robbery had netted between $60,000 and $80,000.

The following day, the police obtained a search and seizure warrant for the defendant's apartment and an

---

[2] The recording device malfunctioned, and, thus, the defendant's conversation with Rhodes was not captured on tape.

[3] There was only one apartment on the second floor of the building.

arrest warrant for the defendant. From the defendant's person, the police obtained a gold chain necklace with a large gold pendant depicting a religious scene and a $50 bill bearing an ink stamp identifying it as property of the credit union. The police also discovered fifty-eight $2 bills in a shoe box in the defendant's closet. Some of these bills were stamped with the credit union's markings as well. The police also seized a natural gas company bill that was addressed to "Charles E. Kerr, 30 Groton St., FL 2, Hartford." The defendant was taken to the Enfield police department, where he was interviewed by Murkowicz, who recognized the defendant's voice as the same "gravelly" one he had heard in the conversation with Rhodes the previous day. The defendant also provided a DNA sample, which would later be compared to DNA found on one of the masks discovered in the getaway vehicle.

Police contact with Beaufort resulted in their obtaining a cash receipt and a business card from Veronica's Jewelry in Hartford, as well as a $100 bill stamped with the credit union's routing number. Enfield police interviewed the owner, Margarita Rodriguez, and an employee, Pura Gonzalez, at Veronica's Jewelry. The officers separately interviewed the women, showing them the gold necklace and pendant that had been seized from the defendant, as well as two photographic arrays, one which contained the defendant's photograph and another that contained Beaufort's photograph. Gonzalez recognized the defendant from his photograph. She stated that the defendant had been in the store on February 10, 2004, when he spent roughly forty-five minutes shopping for jewelry and that he eventually purchased a necklace and pendant, which she identified as being the one the police seized from the defendant. She also stated that the defendant bought a gold ring during the same store visit. Gonzalez recalled that the defendant had paid $1400 cash for the jewelry

and that he had "a different voice" that was "[f]unny, [g]ravelly." Rodriguez also identified the defendant from a photographic array, but she was less than 100 percent certain that he was the man she had seen in her jewelry store. When looking at the photographic array, she identified a second man as looking similar to the defendant, but she said that the man whom she had seen in the store had an "unusual voice." She also confirmed that the first man, whom she tentatively identified, had bought the seized necklace and a ring for $1400 on February 10, 2004, paying in $20 and $50 bills.

The jury also heard testimony from Patricia Johannes, a forensic examiner with the department of public safety forensic science laboratory, regarding a "mixed" DNA sample[4] that was taken from the interior and exterior surfaces of one of the ski masks found in the getaway vehicle. Johannes testified that when the sample taken from the ski mask was compared with the DNA sample taken from the defendant, the defendant's DNA could not be excluded, or eliminated, as a possible contributor to the DNA sample taken from the mask. Johannes explained that DNA comparison requires studying the alleles, which are "basically . . . a different form of DNA," that are present at thirteen specific locations, or loci, and then comparing the alleles from one sample of DNA to those found in another sample of DNA. When comparing the defendant's DNA to the DNA found on the ski mask, Johannes found that the two samples contained the same alleles at eleven of the thirteen loci. At the remaining two loci, the "mixed" sample was insufficient to make any accurate determination.[5] Johannes testified that the probability of randomly selecting an individual from the African-American population who would match all eleven of

---

[4] A "mixed" sample is one which consists of DNA from multiple sources or contributors.

[5] Johannes testified that "[s]ome of the loci that we look at are very small, and they amplify more readily than the larger pieces of DNA. The larger pieces of DNA are more susceptible to degradation. So, therefore, if they—

the loci, which were common between the defendant's DNA and the DNA taken from the ski mask, was roughly 1 in 43 million. She also testified that based on the DNA evidence, the expected frequency of individuals in the African-American population that could not be eliminated as a possible contributor to the mixed sample was 1 in 7 million. Because there were additional alleles present, due to the fact that there were multiple contributors to the "mixed" sample, as well as because the sample was insufficient to determine the alleles that were present at the two remaining loci, there was not a conclusive DNA match. The defendant's DNA, nevertheless, was consistent with the DNA found in the ski mask and could not be excluded as a possible match.

On September 26, 2007, the jury found the defendant guilty on all counts. On November 18, 2007, the court sentenced the defendant to a total effective term of eighteen years incarceration. This appeal followed. Additional facts will be set forth as necessary.

On appeal, the defendant alleges that the court improperly permitted Spellman and Curtis to testify regarding incriminating statements, purportedly made by the defendant, as they were inadmissible hearsay.[6] The defendant maintains that the statements should not have been admitted into evidence because Spellman and Curtis could not see the "gravelly" voiced man that

---

if the pieces of DNA begin to degrade, they may not amplify. So, these larger loci, sometimes what we [say, is that] they drop out. . . . [T]he DNA is not in good enough condition for it to amplify."

[6] The state argues in its brief that the defendant failed to preserve his claim at trial properly, on the ground that he objected to Spellman's and Curtis' testimony only as inadmissible hearsay and did not make a distinct claim that their testimony lacked foundation. We do not agree. Defense counsel's objection at trial that the proffered testimony was hearsay was, in no material way, different from the defendant's claim on appeal that it was admitted without a proper evidentiary foundation. In this instance, the defendant's claim regarding the lack of a proper foundation is no more or less than an assertion that the testimony was inadmissible hearsay.

Rhodes spoke with inside the building at 30 Groton Street, nor did they have any basis for comparison to identify the defendant's voice, and, thus, they could not show that the statements were made by the defendant. The defendant argues further that as a result of this alleged hearsay testimony, he suffered extreme prejudice. We are not persuaded.

We begin by setting out the relevant law regarding hearsay. "[A]n out-of-court statement offered to establish the truth of the matter asserted is hearsay. . . . As a general rule, such hearsay statements are inadmissible unless they fall within a recognized exception to the hearsay rule." (Internal quotation marks omitted.) *State* v. *Faison*, 112 Conn. App. 373, 383, 962 A.2d 860, cert. denied, 291 Conn. 903, 967 A.2d 507 (2009); see Conn. Code Evid. § 8-1 (3). "Among the recognized exceptions to the hearsay exclusionary rule is that for admissions of a party. . . . [S]tatements made out of court by a party-opponent are universally deemed admissible when offered against him . . . so long as they are relevant and material to issues in the case. . . . [T]he vast weight of authority, judicial, legislative, and scholarly, supports the admissibility without restriction of any statement of a party offered against that party at trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Woodson*, 227 Conn. 1, 15, 629 A.2d 386 (1993); see Conn. Code Evid. § 8-3 (1).

The parties do not dispute that the contested statements were hearsay, nor do they dispute the fact that the court allowed the statements to be admitted into evidence on the basis of the exception to the hearsay rule for admissions of a party opponent. The controversy is whether the court reached the proper conclusion in admitting the officers' testimony. The standard of review for the defendant's evidentiary claim is well established. "Unless an evidentiary ruling involves a clear misconception of the law, [t]he trial court has

broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling . . . ." (Internal quotation marks omitted.) *State* v. *Marshall*, 114 Conn. App. 178, 186–87, 969 A.2d 202, cert. denied, 292 Conn. 911, 973 A.2d 661 (2009). "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the [impropriety] was harmful." (Internal quotation marks omitted.) *State* v. *Orr*, 291 Conn. 642, 663, 969 A.2d 750 (2009).

"[T]he proper standard for determining whether an erroneous evidentiary ruling is harmless [is] . . . whether the jury's verdict was substantially swayed by the error." *State* v. *Sawyer*, 279 Conn. 331, 357, 904 A.2d 101 (2006), overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 455 n.23, 953 A.2d 45 (2008) (en banc). "[A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) Id. "[W]hether [the improper admission of a witness' testimony] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) *State* v. *Orr*, supra, 291 Conn. 663.

Accordingly, in order for the defendant to succeed on appeal, we must not only find that the court abused its discretion in admitting the disputed evidence but, also, that the defendant suffered harm as a result of the court's ruling. In this instance, we address this claim by following the analytical path of *State* v. *Bonner*, 290 Conn. 468, 501, 964 A.2d 73 (2009), in which the court assumed arguendo that the challenged evidence was admitted improperly and chose only to discuss the lack of harm on the ground that if admission of the evidence under scrutiny caused the defendant no harm, the court, on review, need not address the propriety of the ruling. Based on the weight of the state's evidence absent the contested testimony, as well as the fact that the challenged testimony largely was cumulative of testimony from others, we conclude that the defendant has failed to demonstrate that he was harmed by the court's ruling at issue.

In order to assess whether the defendant was harmed as a result of the testimony from Spellman and Curtis, we first compare the testimony of the respective police officers to determine whether Spellman's and Curtis' testimony merely was cumulative of the testimony of Murkowicz. As noted, Murkowicz testified regarding his role in the investigation into the credit union robbery.[7] He explained that Rhodes provided him with information about the credit union robbery, then agreed to wear an electronic recording device and go to the defendant's home for the purpose of getting the defendant to discuss the robbery. Murkowicz testified that he had been a member of the police surveillance team that listened via radio transmission to the conversation between Rhodes and a man with a gravelly voice. Murkowicz also testified that after the defendant was arrested, he spoke with the defendant and recognized

---

[7] The defendant does not claim that the court erred in allowing Murkowicz to testify regarding statements made by the defendant.

the defendant's voice from the previous day's monitored conversation with Rhodes. Thus, unlike Spellman and Curtis, Murkowicz was able to match specifically the gravelly voice with the defendant's voice. As to the conversation with Rhodes, Murkowicz recalled hearing the defendant say (1) that he thought the police had his fingerprints on the cash drawer, (2) that he went back to the location where he and the other perpetrators left the abandoned vehicle to look for some money, (3) that a third party had reported the getaway vehicle stolen, (4) that he had to give $18,000 to one of the individuals involved in the robbery, (5) that he bought a microwave oven and (6) that coconspirator Beaufort bought some jewelry.

Later in the trial, Curtis testified, in very similar fashion, that he heard the defendant say (1) that he thought that he had left his fingerprints on the cash tray, (2) that the getaway vehicle had to be abandoned and that he and the other perpetrators ran from the vehicle through some backyards, (3) that there was money left in the vehicle and dropped on the ground, (4) that he went back to the location where they abandoned the vehicle to look for some of the money that had been dropped, (5) that he had used some of the money from the robbery to buy a microwave oven and (6) that he had to pay Beaufort and another man, Max, $18,000. Finally, Spellman testified that he had heard the defendant say that they had netted between $60,000 and $80,000 in the robbery.

From our review, it is apparent that the testimony of Curtis and Murkowicz is largely parallel. The similarities in their recollections of the conversation are far more important corroboration that they were listening to the same conversation than the few instances in which one officer recalled statements about which the other did not testify. While Spellman's testimony does not appear to have corroborated either that of Murkow-

icz or Curtis, except as to the gravelly voice, the substance of his testimony, regarding the sum of money taken during the robbery, was cumulative of the testimony of a credit union employee.

In assessing the defendant's claim of harm, we look, as well, to the strength of the state's case absent the statements at issue. Our review of the record convinces us that the state presented a substantial amount of evidence tying the defendant to the robbery of the credit union. As noted, the state adduced evidence that ski masks were used in the robbery and were later found in the getaway vehicle. One of those masks revealed a mixed sample of DNA, which, to a high degree of probability, contained the defendant's DNA. Although he recanted his written statement of January 22, 2004, at trial, there was testimony that Rhodes, the police informant, had disclosed to police officers prior to the robbery that he had driven the defendant and Beaufort to the credit union to assess whether they wanted to rob that location and that they said that they were going to do so.[8] After the robbery, when Rhodes talked to detectives, he clearly indicated that he had knowledge of the robbery and that he knew of the defendant's involvement. Rhodes agreed to wear a wire and went inside 30 Groton Street, where the defendant lived, and engaged in conversation with a man who had a gravelly voice. Murkowicz, whose testimony is unchallenged,

---

[8] Rhodes provided a written statement to Bloomfield police when he was arrested on January 22, 2004. At trial, the court allowed the statement to be read into evidence under the *Whelan* doctrine. *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86 (substantive use of prior written, inconsistent statements signed by prosecution witness permissible where witness testified at trial and was subject to cross-examination), cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). Rhodes' statement asserted that "[t]his past Monday I gave Kirk and Buford a ride to the . . . credit union off of exit [forty-nine] [on] [Interstate] 91. Once at the credit union they checked it out, and said they liked it and stated they were going to hit it this week. They sent their front girl into the bank today [January 22, 2004] to case the place. They prefer to hit places near the highway for a fast escape."

identified that gravelly voice as belonging to the defendant and revealed that the defendant made incriminating statements in which he clearly implicated himself in the robbery. During the search of the defendant's apartment at 30 Groton Street, the same location where the police surveillance team overheard Rhodes talk with the defendant, the police found fifty-eight $2 bills in a shoe box in the defendant's closet, which could be linked to the credit union by ink stamps and certain numeric codes. The defendant also had a $50 bill in his pocket, which contained a marking from the credit union. A worker at a jewelry store identified the defendant from a photographic array as having been in the store the day after the robbery and recalled that he had a large amount of cash and purchased jewelry for $1400.

Finally, there was significant evidence from several witnesses regarding a gravelly voiced male. Two credit union employees testified that one of the robbers had a distinctive, gravelly voice. The worker at the jewelry store stated that the defendant had a gravelly voice, as did the owner of the store. As noted, Murkowicz, Curtis and also Spellman all testified that they heard the voice.

The defendant argues, nevertheless, that without the disputed testimony, the jury might have viewed all of the other evidence against him differently. He claims that because the state's case was based largely on circumstantial evidence, the corroborative nature of the testimony from Curtis and Spellman was especially prejudicial. We are unpersuaded. Given the substantial evidence of the defendant's guilt, apart from the testimony of Spellman and Curtis, we are not satisfied that the admission of their testimony, even if incorrect, caused harm to the defendant.

The defendant argues, finally, that we cannot conclude that Spellman's and Curtis' testimony was cumulative because we cannot know, with any reasonable

certainty, that Murkowicz, Spellman and Curtis heard the same voice. In this regard, the defendant claims that because there was no testimony as to the exact time of day, during the one and one-half hour conversation with Rhodes, that each of the respective officers heard the statements about which they testified, we cannot conclude with a reasonable degree of certainty that there were not two or more gravelly voiced persons in the defendant's apartment. In sum, the defendant argues that the officers could well have been listening to different gravelly voiced people and even to different conversations. The defendant buttresses this claim with the observation that the officers' testimony was not, in all respects, identical. We are unpersuaded.

As noted, the officers all testified that they were in the area of 30 Groton Street while listening to the conversation. They also all testified that they heard Rhodes speaking to a man with a gravelly voice. It strains credulity to suppose they could have been listening to different ninety minute conversations between Rhodes and different people.[9] There was no evidence presented to the jury that there was more than one adult present in the apartment with Rhodes. Additionally, there was no evidence from which one reasonably could infer that there was more than one conversation heard by all the officers. The fact that three and one-half years after the events in question the police officers did not testify in mirrored fashion as to the ninety minute conversation simply suggests that each may have remembered some different aspects of the conversation or that the prosecutor did not ask each police officer the same questions at trial. And, as noted, there were significant similarities in the testimony of Murkowicz and Curtis.

---

[9] Although the defendant claims there were other voices present during the conversation at 30 Groton Street, the only testimony to that effect was from Spellman, who mentioned hearing children's voices intermittently in the background.

We conclude, therefore, that even without the challenged testimony of Spellman and Curtis, the state presented ample evidence from which the jury could have found the defendant guilty beyond a reasonable doubt and that the inclusion of the disputed testimony did not cause the defendant to suffer harm at trial.

The judgment is affirmed.

In this opinion DiPENTIMA, J., concurred.

PETERS, J., concurring. I agree with the majority that the conviction of the defendant, Charles E. Kerr, must be affirmed, but I would base that affirmance on the sufficiency of the evidence to establish that the defendant made the incriminating statements whose admissibility he contests rather than on a determination of harmless error. I therefore concur in the judgment of the court.

The central issue raised by the defendant's appeal is whether the state adduced sufficient evidence to establish that he was the speaker of certain incriminatory statements. Although out-of-court statements offered to prove the truth of the matter asserted generally are inadmissible hearsay, the defendant does not dispute the applicability of § 8-3 of the Connecticut Code of Evidence that makes statements of a party opponent admissible. He argues, instead, that the state failed unambiguously to " 'connect' " his voice to the voice sought to be identified in court as that of the incriminatory speaker.

The majority opinion responds to the defendant's claim by invoking the principle of harmless error on the ground that the testimony of Lieutenant Lawrence Curtis and Detective Robert Spellman was cumulative

of other unchallenged evidence in the record.[1] With respect, I find that resolution of the claim problematic. It seems to me that the admissibility of evidence offered by two of the three witnesses for the state on the central issue of whether the defendant made incriminating statements directly tying him to the criminal misconduct in which he allegedly engaged *cannot* be harmless.

Although our case law has not had the occasion to consider whether harmless error analysis is appropriate under such circumstances, I incline to think that so central a failure in the state's proof is structural error. "Structural [error] cases defy analysis by harmless error standards because the entire conduct of the trial, from beginning to end, is obviously affected. . . . Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair." (Internal quotation marks omitted.) *State* v. *Brown*, 279 Conn. 493, 505, 903 A.2d 169 (2006). Just as the effect of the admission of a coerced confession cannot be calibrated in assessing the fairness of a trial; *Arizona* v. *Fulminante*, 499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991); so the evidentiary problem in this case, if there is one, fundamentally implicates the fairness of the defendant's conviction.

I am not, however, persuaded that we need to address this difficult issue because it seems to me that the

[1] Specifically, the majority concludes that Curtis' testimony was duplicative of the testimony of Detective Thomas Murkowicz and that any discrepancies were minor. The majority also concludes that Spellman's testimony concerning the amount of money allegedly taken was cumulative of that of an employee of the Hamilton Sundstrand Federal Credit Union in Enfield, where the robbery at issue occurred. I agree that the testimony of Curtis and Murkowicz was largely duplicative, but I would conclude that the testimony by Spellman was, in fact, corroborative of the testimony by the credit union employee and linked the defendant to the robbery, which the credit union employee alone had not done.

evidence so admirably marshaled in the majority opinion amply demonstrates that the statements at issue were admissible. Section 9-1 (a) of the Connecticut Code of Evidence states: "The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be." The commentary to § 9-1 (a) explains that once a prima facie showing is made that the evidence is what the proponent claims it to be, "the evidence may be admitted and the ultimate determination of authenticity rests with the fact finder." The question in the present case, then, is whether the state presented sufficient evidence from which the jury reasonably could have found that the statements attributed to the defendant, which were admissible as hearsay statements by a party opponent, were made by the defendant.

In my view, the state properly relied on the testimony of Curtis and Spellman concerning the statements that they heard while listening to the electronic monitoring device worn by Danny Rhodes, the police informant, because Detective Thomas Murkowicz provided a voice identification that was based on his personal knowledge of the defendant's voice. See Conn. Code Evid. § 9-1 (a) (5), commentary ("[a]ny person having sufficient familiarity with another person's voice . . . can identify that person's voice or authenticate a conversation in which the person participated"). The defendant acknowledges that a voice identification may be made if "there is a basis of comparison for making the identification, the opportunity for which may come either before or after the event." *State* v. *Jonas*, 169 Conn. 566, 577, 363 A.2d 1378 (1975), cert. denied, 424 U.S. 923, 96 S. Ct. 1132, 47 L. Ed. 2d 331 (1976).

The defendant argues that Murkowicz' identification does not authenticate the conversation heard by Curtis and Spellman, but his argument is unconvincing. There

is no evidence in the record to suggest that the three detectives heard different conversations involving Rhodes.[2] As detailed by the majority, the discrepancies in the testimony of Murkowicz and Curtis were minor. None of the officers testified that they heard Rhodes converse with more than one person. They all described the same gravelly voice.

Second, other circumstantial evidence also supports the conclusion that the voice heard by Curtis and Spellman was the defendant's. Rhodes agreed to speak with the defendant. Rhodes was seen entering the building located at 30 Groton Street, Harford, and was heard ascending the stairs to the second floor. There was only one second floor apartment in the building, which was the defendant's residence.

On this record, the jury reasonably could have found that Curtis and Spellman heard Rhodes speaking with the defendant. The Federal Rules of Evidence and supporting case law follow a similar analysis concerning the admission and authentication of statements by a party opponent. "Federal Rule of Evidence 901 (a) provides that identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what it purports to be. Identification of a voice heard through electronic transmission or recording may be established by an opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker or other circumstantial evidence. . . . [S]ee *United States* v. *Turner*, 528 F.2d 143, 163 (9th Cir. 1975) ([v]oice identification may be made both by direct evidence . . . consisting of telephone numbers, telephone wire tap locations, street addresses, both given

---

[2] Although it was not before the jury, a police affidavit for a search warrant indicated that one of the coconspirators was briefly present in the apartment while Rhodes was wearing a wire to record his conversations.

and surnames in telephone conversations, and the observed conduct of appellants in visiting the places of residence of known co-conspirators.). Voice identifications are admissible if the identifying witness is minimally familiar with the voice he identifies. . . . Once the minimal showing has been made, the jury determines the weight to accord to the identification testimony." (Citations omitted; internal quotation marks omitted.) *United States* v. *Mendoza-Morales*, United States District Court, Docket Nos. 05-98-01-RE, 05-98-02-RE, 05-98-03-RE, 05-98-04-RE, 05-98-07-RE (D. Or. January 4, 2008).

I respectfully concur in the result reached by the court.

