STATE OF CONNECTICUT *v.* MARK S. SILVER
(AC 30829)

Harper, Alvord and Peters, Js.

Argued October 25, 2010—officially released February 15, 2011

*Adele V. Patterson*, senior assistant public defender, for the appellant (defendant).

*Adam E. Mattei*, special deputy assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Jonathan C. Benedict*, former state's attorney, for the appellee (state).

*Opinion*

PETERS, J. Pursuant to the spontaneous utterance exception to the hearsay rule, as codified in Connecticut Code of Evidence § 8-3 (2), a declarant's statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is admissible into evidence. See *State* v. *Kelly*, 256 Conn. 23, 41–42, 770 A.2d 908 (2001). The principal issue in this appeal is whether two declarants' calls to 911 emergency services were admissible under this doctrine without extrinsic evidence that the declarants had been speaking under the stress of a startling event. Because we are persuaded of the propriety of the trial court's evidentiary rulings,

we affirm its judgment finding the defendant guilty as charged.

In a two count substitute information filed August 8, 2008, the state charged the defendant, Mark S. Silver, with attempt to commit murder in violation of General Statutes §§ 53a-49 and 53a-54a (a), and assault in the first degree in violation of General Statutes § 53a-59 (a).[1] After a jury trial, the defendant was found guilty on both counts and sentenced by the court to a total effective term of forty years incarceration. The defendant has appealed.

The jury reasonably could have found the following facts. Late in the evening of September 20, 2007, on Hollister Street in Stratford, the defendant became involved in a physical altercation with the victim, Edward Cox. Getting into a gold colored Mercury Sable registered to the victim, the defendant began driving toward the victim. After repeatedly hitting the victim with the car, the defendant severely injured the victim by pushing him under a chain-link fence.

The police were alerted to this incident by several observers at the scene of the crime, who dialed 911 for emergency services. When the defendant sped off, Mark Grass, who had earlier tried to intervene to help the victim, called 911 to report that he was following the

---

[1] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

defendant in his car. When both cars reached an intersection with a red traffic signal, Grass stopped, but the defendant continued through, going up over a curb and a lawn before continuing to speed away. Grass then returned to Hollister Street, where, speaking to the police officers who had responded to the emergency calls, he described what he had witnessed, including a description of the defendant as a black male wearing a white T-shirt and white head garb. That description was then broadcast by the police.

Shortly thereafter, Greg Gosselin, a tow-truck driver, just before leaving his place of employment on his way to a gasoline station, heard the police radio broadcast[2] that described the defendant and his vehicle. En route, he noticed a car being operated erratically and realized that it matched the description broadcast by the police. The car stopped at the same gasoline station as Gosselin did, and he observed the defendant leave his vehicle and discard certain articles of clothing in the trash. Gosselin noted that the front end of the other driver's car had been damaged and that the license plate was displayed in the rear window rather than in the usual place for a license plate.

Believing the driver to be the individual described in the police radio broadcast, Gosselin called 911 to alert the authorities. He remained on the telephone with the emergency dispatcher as he followed the other car when it left from the gasoline station. He described seeing the car accelerate rapidly on the highway and ultimately crash into the center median divider. He reported then seeing the car's driver fleeing from the vehicle and running down the highway, attempting to get into other cars.

---

[2] The broadcast described the vehicle as a gold Ford Taurus type of vehicle and the driver as a black male wearing a white T-shirt. Gosselin testified that the Ford Taurus and the Mercury Sable are virtually identical cars.

When police officers then arrived on the scene, they apprehended and arrested the defendant after a foot chase, a struggle and the use of an electric stun gun. Further facts will be set forth as necessary.

The defendant's appeal to this court challenges the validity of the trial court's rulings that admitted two sets of statements into evidence. The first ruling concerns the admission of pretrial incriminatory statements made by the defendant at Bridgeport Hospital, where he was transported after his arrest. The second ruling concerns the admission at trial of the 911 calls made by Grass and Gosselin. We are persuaded by neither claim of error.

I

Prior to trial, the defendant filed a motion to suppress incriminating statements that he had made to Bridgeport police Officer Clive Higgins at Bridgeport Hospital. The defendant had been transported there because, at the time of his arrest, he appeared to be semiconscious with his eyes rolling back in his head. Upon his arrival at the hospital, a nurse had administered an unidentified medication to the defendant that caused him to regain consciousness.

The court found that while strapped to a gurney in the hallway of the hospital, the defendant saw and called out to Higgins, who was walking through the emergency department. Higgins testified that he responded by asking the defendant, "what [are] you doing here?" The court further found that without any further prompting by Higgins, the defendant replied that he "had been partying with a friend who had taken some of his money and was supposed to pay him back. The defendant further stated that he had 'kicked his ass' and [had run] him over with a car because he had robbed his money." This conversation was observed by

two Stratford police officers, David Evans and John Steedley.[3]

In his motion to suppress these statements at trial, the defendant claimed that his statements to Higgins, in the presence of Evans and Steedley, were inadmissible because they were the result of a custodial interrogation that had occurred prior to his having been informed of his constitutional right to avoid self-incrimination. The court denied the defendant's motion, holding that the question posed by Higgins did not constitute an interrogation because Higgins was not involved with the investigation, the defendant had initiated the contact, and Higgins' question "was neutral, spontaneous and does not reasonably suggest an intent to obtain a confession."

On appeal, the defendant renews his claim that his statements to Higgins should have been suppressed because they resulted from a custodial interrogation to which he had improperly been subjected without having been informed of his constitutional rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). He maintains that, because Higgins had previously arrested him, Higgins should have recognized that he was at the hospital in the custody of another police department. We disagree.

"As a general matter, the standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . As we have noted previously, however, when a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, and the credibility of witnesses is not the primary issue, our customary deference to the

---

[3] Steedley testified that he had not heard the defendant's statements to Higgins.

trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [W]here the legal conclusions of the court are challenged, [our review is plenary and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Bridges*, 125 Conn. App. 72, 78–79, 6 A.3d 223 (2010).

"[T]he ultimate determination . . . of whether a defendant already in custody has been subjected to interrogation . . . presents a mixed question of law and fact over which [this court's] review is plenary, tempered by [a] scrupulous examination of the record to ascertain whether the findings are supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Acosta*, 119 Conn. App. 174, 181, 988 A.2d 305, cert. denied, 295 Conn. 923, 991 A.2d 568 (2010). Because, in this case, the state concedes that the defendant was in custody and had not been informed of his constitutional right not to incriminate himself, the only issue before us on appeal is whether the defendant's statement to Higgins was a response to an interrogation.

"It is well established that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination. *Miranda* v. *Arizona*, [supra, 384 U.S. 444]. Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . .

"A defendant in custody is subject to interrogation not only in the face of express questioning by police

but also when subjected to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . Whether a defendant in custody is subject to interrogation necessarily involves determining first, the factual circumstances of the police conduct in question, and second, whether such conduct is normally attendant to arrest and custody or whether the police should know that such conduct is reasonably likely to elicit an incriminating response. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." (Citations omitted; internal quotation marks omitted.) *State* v. *Canady*, 297 Conn. 322, 335–36, 998 A.2d 1135 (2010).

In *Canady*, the defendant, who was charged with and convicted of felony murder, had been arrested for an unrelated offense. While he was being held at a juvenile detention center, the defendant spoke on the telephone with his mother, who informed him of the pending murder investigation. After hanging up, he appeared "distraught and very scared," prompting an officer at the facility to ask, "are you okay?" (Internal quotation marks omitted.) Id., 330. The defendant's incriminating statements in response were held to be admissible because the inquiry did not constitute an interrogation, and *Miranda*, therefore, did not apply. Id., 334–35. *Canady* emphasized the significance of three facts: (1) the officer asking the question had no reason to know of the pending murder investigation, (2) the question

itself was innocuous, brief and neutral, and (3) the statements by the defendant were volunteered. Id., 337–38.

*Canady* is dispositive of the defendant's claim of custodial interrogation in this case. Here, too, there is nothing in the record to suggest that Higgins would have had reason to believe that his inquiry into the defendant's hospitalization would evoke an incriminating response. Higgins testified that when he asked the defendant what he was doing, he did not yet know that the defendant was under arrest. The question, "what [are] you doing here," was a natural reaction to seeing someone with whom he was familiar in the hospital. Further, as in *Canady*, the defendant volunteered his statements with no further inquiry by Higgins. Finally, Higgins' knowledge of the defendant's criminal history, because he had arrested him in the past, was not dispositive because, in *Canady*, the defendant also had previously been arrested for other offenses. The teaching of *Canady* is that an officer's knowledge that the defendant has a criminal history does not turn an officer's otherwise neutral question into a question likely to elicit an incriminating response.

In light of the relevant circumstances, we hold that the court properly denied the defendant's motion to suppress his incriminatory statements to Higgins. The court properly rejected the defendant's contention that his statements had resulted from an interrogation by Higgins.

## II

The defendant's second contention on appeal is that the trial court improperly admitted into evidence the 911 recordings of the calls made by Grass and Gosselin. These recorded statements were an important part of the state's evidence to establish the defendant's identity as the driver of the victim's car at the time that it struck

and injured the victim. Although the defendant did not deny that he had been driving the victim's car when he was arrested later that evening, at trial he contested the state's charge that he was the person who had been observed, earlier in the evening, driving the car that had struck the victim. The eyewitnesses to the crime who testified at trial did not identify the defendant as the person who had assaulted the victim. Accordingly, at trial, the defendant questioned Grass' and Gosselin's credibility insofar as their testimony linked him to the crimes with which he was charged.

In addition, the defendant challenged the playing of the recordings of Grass' and Gosselin's 911 reports to the jury. He argued that these recordings were inadmissible hearsay that would unnecessarily inflame the emotions of the jury. Overruling his objections, the court held that the evidence was admissible under either the spontaneous utterance exception to the hearsay rule; see Conn. Code Evid. § 8-3 (2); or the residual exception to the hearsay rule. Conn. Code Evid. § 8-9. It further ruled that admission of this evidence did not violate the defendant's constitutional right to confront the witnesses against him.[4] Explaining its ruling, the court stated: "I've listened to these calls, the people are reporting in real time what they're seeing, and, quite frankly, the timbre of their voice tends to reveal the emotional reaction to what they're perceiving in a contemporaneous way. It seems to me classic evidence where there's a lack of opportunity for . . . deliberation and fabrication or scheming and thinking about what to say, and so I find . . . this evidence is admissible under [the] excited utterance [exception]."

---

[4] The defendant also argued at trial that the recordings violated his sixth amendment right to confront witnesses. On appeal, the defendant does not challenge the court's conclusion that there was no constitutional bar to the admission of the 911 recordings.

On appeal, although the defendant does not contest the sufficiency of the evidence to convict him as charged in light of the evidence presented by the state, he maintains that the court improperly admitted the recordings of the calls to 911 made by Grass and Gosselin and that he was prejudiced by these allegedly improper rulings.

We disagree. We are persuaded that the court's evidentiary ruling was proper. Furthermore, the fact that Grass and Gosselin both testified at the defendant's trial renders any conceivable error in the court's ruling harmless.

## A

The defendant's challenge to the admissibility of the recordings of Grass' and Gosselin's calls to 911 emergency services as spontaneous utterances rests on his claim that, for two reasons, these calls did not meet the requirements of § 8-3 (2) of the Connecticut Code of Evidence.[5] The defendant maintains, first, that the record does not establish that these witnesses were either startled or were speaking spontaneously when making their 911 statements. He maintains that, when the declarants called 911, they manifested by their actions that they were able to use reason and judgment, and, thus, their statements were inadmissible because they were simply hearsay. Alternatively, the defendant faults the court for having failed to make specific factual findings in support of its evidentiary rulings.[6]

[5] We note that the court also admitted the recordings under the residual exception to the hearsay rule, but because we hold that the recordings were properly admitted as spontaneous utterances, we need not consider the propriety of this alternate basis for the admission of the evidence.

[6] We note that, to the extent that there are deficiencies in the court record, it was the responsibility of the defendant to take curative action. Practice Book § 61-10. The record is clear that the court admitted the recordings as spontaneous utterances.

We first address the standard of review that governs our resolution of the defendant's claims. The defendant argues that he is entitled to plenary review of his contention that the court misapplied the spontaneous utterance exception to the hearsay rule because, in his view, the court misconstrued the foundational requirement of evidence of a startling occurrence. We disagree.

Both our Supreme Court, in *State* v. *Kirby*, 280 Conn. 361, 376–77, 908 A.2d 506 (2006), and this court, in *State* v. *Torelli*, 103 Conn. App. 646, 662, 931 A.2d 337 (2007), have held that recordings of 911 telephone calls may be admissible as nontestimonial spontaneous utterances under § 8-3 (2) of the Connecticut Code of Evidence. See also *Davis* v. *Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). The defendant has not challenged the validity of these holdings as a matter of law.

Instead, the defendant argues that the spontaneous utterance exception does not apply to the Grass and Gosselin 911 recordings because, in his view, their statements were demonstrably *not* spontaneous. Although the defendant couches his claim as a challenge to a legal conclusion by the court, the defendant, in fact, is challenging the sufficiency of the court's evidentiary basis for concluding that the statements by the declarants met the requirements for a spontaneous utterance, namely, whether, in this case, the declarants were subject to a startling event or occurrence. "[W]e review the trial court's determination that the . . . statement was an excited utterance under the abuse of discretion standard. . . . [W]hether a statement is truly spontaneous as to fall within the spontaneous utterance exception will be reviewed with the utmost deference to the trial court's determination . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Slater*, 285 Conn. 162, 178, 939 A.2d 1105, cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008). "Whether

an utterance is spontaneous and made under circumstances that would preclude contrivance and misrepresentation is a preliminary question of fact to be decided by the trial judge. . . . The trial court has broad discretion in making that factual determination, which will not be disturbed on appeal absent an unreasonable exercise of discretion." (Internal quotation marks omitted.) *State* v. *Davis*, 109 Conn. App. 187, 193, 951 A.2d 31, cert. denied, 289 Conn. 929, 958 A.2d 160 (2008).

The admissibility of the 911 recordings that are at issue in this case is governed by § 8-3 (2) of the Connecticut Code of Evidence. Pursuant to that section, "[h]earsay statements, otherwise inadmissible, may be admitted into evidence to prove the truth of the matter asserted therein when (1) the declaration follows a startling occurrence, (2) the declaration refers to that occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation and fabrication by the declarant." (Internal quotation marks omitted.) *State* v. *Kendall*, 123 Conn. App. 625, 666, 2 A.3d 990, cert. denied, 299 Conn. 902, 10 A.3d 521 (2010); see C. Tait & E. Prescott, Connecticut Evidence § 8.17.3 (4th Ed. 2008).

In its ruling rejecting the defendant's objection to the recordings, the court did not specify what had startled the speakers, and it did not use the term "startling occurrence." Instead, the court found that the declarants were exposed to "an ongoing urgent situation . . . ." The record reveals that Grass witnessed a car hit a man more than once, heard the driver scream threats at the victim and then race off at an extreme speed. The record further reveals that Gosselin witnessed a vehicle driving erratically, realized that the car and driver fit the description broadcast by police for a hit-and-run driver and then himself became engaged in a high-speed chase. This evidence supports the court's findings and provides a sufficient basis for the admis-

sion of the recordings as describing "a startling occurrence, that is, one of such a nature as to produce nervous excitement in the declarant and render his or her utterances spontaneous and unreflecting." C. Tait & E. Prescott, supra, § 8.17.3.[7]

Furthermore, the defendant has not cited, and we are not aware of, any case law standing for the proposition that evidence of reasoned thinking negates a finding that a witness made a spontaneous utterance. Most of the cases cited by the defendant are inapposite.[8] The

---

[7] While the defendant is correct that the court did not identify precisely what aspect of the ongoing events would be startling to the callers, the defendant bears the burden of requesting the court to articulate the basis for its decision, and he failed to do so. Indeed, the defendant never even raised the issue of whether the declarants experienced a startling occurrence.

[8] In *State* v. *Nelson*, 105 Conn. App. 393, 406–408, 937 A.2d 1249, cert. denied, 286 Conn. 913, 944 A.2d 983 (2008), this court rejected the defendant's contention that recordings of the victim's call to 911 should not be admitted as spontaneous utterances because the victim was not under sufficient stress when he made the call.

In *State* v. *Yednock*, 14 Conn. App. 333, 345–46, 541 A.2d 887 (1988), the statements of the victim, made one month after the occurrence, were not excited utterances, despite the fact that the statements were made in response to a different stressful occurrence. In the present case, there is no claim raised that the events described by the declarants are distinct from the requisite startling event.

In *State* v. *Davis*, supra, 109 Conn. App. 194–95, it was proper for the court to consider that the declarant's inability to speak prior to making the contested statement supported the finding that he did not have the opportunity to reflect on the occurrence and fabricate the statements. *Davis* does not, as the defendant asserts, stand for the much broader proposition that the ability to speak tends to show that the speaker is reflecting on the events in a way that would call into question the spontaneity of the statements.

Finally, in *State* v. *McNair*, 54 Conn. App. 807, 813, 738 A.2d 689, cert. denied, 251 Conn. 913, 739 A.2d 1249 (1999), the trial court erred in admitting the testimony of a witness who gave a statement to police thirty minutes after witnessing a stabbing from her window. In *McNair*, the court held that while not dispositive, the time between the startling event and the statement influenced the conclusion that the statement was not admissible, particularly when combined with the fact that the witness "was not the actual or intended victim, or even a close bystander." Id. *McNair*, therefore, is inapposite to the facts of the present case because here the recordings

defendant also relies on *State* v. *Dollinger*, 20 Conn. App. 530, 538, 568 A.2d 1058, cert. denied, 215 Conn. 805, 574 A.2d 220 (1990), which held that the statements of a child describing acts of sexual abuse did not qualify as spontaneous utterances because she "did not appear to be in any distress. . . . [T]he tone of her statement was more consistent with composure than excitement and spontaneity." The court in *Dollinger* further noted that "there is nothing in the record from which the court could have found that the startling occurrence and the statement were contemporaneous." Id. That is not this case.

"The ultimate question is whether the utterance was spontaneous and unreflective and made under such circumstances as to indicate absence of opportunity for contrivance and misrepresentation." (Internal quotation marks omitted.) *State* v. *Torelli*, supra, 103 Conn. App. 662. Unlike *Dollinger*, the record amply supports the court's ruling that, in this case, the statements on the 911 recordings bore sufficient indicia of reliability in light of their contemporaneous descriptions of events as they unfolded and the absence of any opportunity for the declarants to fabricate their statements. Furthermore, the court expressly noted and relied on the emotional tone of voice manifested by the recordings.

In light of the totality of the evidence of record, the court did not abuse its discretion in concluding that the 911 statements by Grass and Gosselin that were recorded by the police and presented by the state were admissible as spontaneous utterances. They were thus admissible under the provisions of § 8-3 (2) of the Connecticut Code of Evidence.

were contemporaneous accounts of events unfolding before witnesses who were closely involved. Although we do not wish to encourage the kind of vigilantism the witnesses undertook, it is clear that they were involved in the events they described rather than just distant witnesses, even if that involvement was of their own accord.

## B

Alternatively, the admission of the 911 recordings, even if it had been improper, was harmless. At the defendant's trial, both Grass and Gosselin testified about the contents of the recordings and what they witnessed. The defendant makes no claim that he could not fully cross-examine the declarants. Because the recordings were cumulative of the trial testimony of Grass and Gosselin, their admission, if error, was harmless. See, e.g., *State* v. *Kerr*, 120 Conn. App. 203, 215, 991 A.2d 605, cert. denied, 296 Conn. 907, 992 A.2d 1136 (2010).

The defendant argues, however, that the admission of the recordings helped rehabilitate Grass as a witness. He maintains that Grass' reliability had been called into question due to his having been convicted of unrelated felony offenses. He emphasizes the significance of Grass' testimony to establish the defendant as the person who assaulted the victim.[9]

Even if the recording helped to rehabilitate Grass, there was sufficient other evidence in the record from which the jury reasonably could have found that the state established the defendant's identity beyond a reasonable doubt. We note that, at the time he was apprehended, the defendant recently had abandoned the victim's car, a car that matched the description given by six different eyewitnesses. The state also introduced consciousness of guilt evidence to buttress its case. In

---

[9] The defendant inexplicably argues that testimony given by Grass concerning the clothing he observed, specifically, white head garb and a white T-shirt that were later recovered at the gasoline station where Gosselin saw the defendant remove those items, would not have been admissible without the 911 recordings. As the state notes, however, the recording did not contain the description of the clothing, Grass' trial testimony did, and there is nothing in the record to suggest that "this testimony would not have been admitted but for the admission of Grass' 911 call."

light of this evidence that was probative of the defendant's identity as the victim's assailant, we are not persuaded by the defendant's claim of error.

In sum, we conclude that the court properly admitted into evidence the incriminating statements to which the defendant objects. Pretrial, the court properly denied the defendant's motion to suppress the statements he made at the hospital because, although he was in custody and had not been informed of his *Miranda* rights, he was not subjected to an interrogation. At trial, the court properly admitted into evidence, as spontaneous excited utterances, the 911 recordings of statements made by Grass and Gosselin because the record amply supports the court's underlying factual findings.

The judgment is affirmed.

In this opinion the other judges concurred.