******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DARRYL BONDS
(AC 38309)

Alvord, Prescott and Mihalakos, Js.

*Argued December 13, 2016—officially released April 4, 2017*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, White, J.)

*Stephan E. Seeger*, with whom, on the brief, was *Igor
G. Kuperman*, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney,
with whom, on the brief, were *David I. Cohen*, former
state's attorney, and *Joseph C. Valdes*, senior assistant
state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Darryl Bonds, appeals from the judgment of conviction, rendered after a jury trial, of one count of felony murder in violation of General Statutes § 53a-54c,[1] one count of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), and one count of conspiracy to commit robbery in the second degree in violation of General Statutes §§ 53a-48 (a) and 53a-135. On appeal, the defendant claims that the trial court improperly (1) admitted two separate out-of-court statements under our hearsay exception for statements against penal interest, (2) admitted an out-of-court statement made by the defendant that was not properly authenticated, and (3) denied the defendant's request to instruct the jury on an affirmative defense to felony murder. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On October 28, 2009, approximately one week before the victim, Denny "Pun" Alcantara, was robbed and shot, Tyrone Tarver told Shari Johnson, a childhood friend, that "he was going to set [Pun] up to get robbed because he thought that [Pun] was soft." Tarver then stated that "he was going to call [Pun] up and tell him that he wanted, like, ten bags of weed. And at that point, that's when [Tarver] was going to set [Pun] up . . . ." In response to this plan, Johnson expressed her disappointment in Tarver and his behavior, and the two had a "blow-out argument."

On November 4, 2009, at approximately 4 p.m., the victim spoke on the telephone with his friend, Richard Patterson, to confirm that they would be watching the World Series together later that evening at the apartment of another friend, Anthony LaCrete, at 62 Stillwater Avenue in Stamford. The victim also told Patterson that he was going to meet with Tarver later that evening outside LaCrete's house, the purpose of which was later revealed to be to sell marijuana to Tarver.

On the same day, at about 5:20 p.m., the defendant called his cousin, Yvannia Collazo, and asked her to drive him and some friends to Stillwater Avenue to buy some "weed." She agreed, and when she went to pick up the defendant, he entered the car with his two friends, Tarver and Joshua McNeil. She then dropped the three men off in the vicinity of Stillwater Avenue, parked her car in a local parking lot, and went into a nearby salon to use the restroom.

At about 5:40 p.m., Tarver called the victim. Shortly thereafter, the victim called LaCrete, who was holding the victim's drugs in his Stillwater Avenue apartment, and asked for his "pack," i.e., his bundle of marijuana. At that point, LaCrete walked downstairs to the bottom of the stairwell at the back of his house, delivered the drugs to the victim, and went back upstairs. The victim

then went outside to make the sale to Tarver.

At about this time, Patterson was walking along Stillwater Avenue and saw the victim, who was wearing a black leather jacket and a thick gold chain, sitting alone on the porch at 62 Stillwater Avenue. Patterson told the victim that he was meeting someone and would be back soon to watch the game, and continued walking down the street. As he was cutting through a parking lot, Patterson saw three men—Tarver, the defendant, and an individual later identified as McNeil—and informed them that "Pun" was waiting for them around the corner, to which Tarver and the defendant replied, "okay."

At about 6 p.m., Gustavo Lopez was working at a travel agency on Stillwater Avenue when he observed two black males wearing hoodies in the agency's parking lot. The men were soon joined by a third male, and all three eventually started walking in the direction of 62 Stillwater Avenue. Within minutes of when Lopez saw the men leave the parking lot and when Patterson left the defendant and Tarver, the victim was shot twice in the stomach.

LaCrete heard the two gunshots from where he was inside the house, followed by the victim repeatedly calling out, "Tony," in distress. This prompted LaCrete to run downstairs and open the door, at which point the victim stumbled in, bleeding. LaCrete asked the victim who had shot him, and the victim replied, "nigga shot me." An ambulance and the police arrived on the scene within five minutes of the shooting, and the victim was observed to be missing his black leather jacket, gold chain, cell phone, money, and marijuana. The victim ultimately died of a gunshot wound to the abdomen.

Meanwhile, after walking out of the salon and immediately hearing gunshots, Collazo got back into her car and instantly observed McNeil "at [her] door side." Within seconds, the defendant and Tarver also ran back to the car and got in, with the defendant sitting in the front and Tarver sitting in the back with McNeil. Acting nervous and jittery, the defendant directed Collazo to "hurry up and leave." While driving away, Collazo noticed Tarver wearing a black leather jacket that he had not been wearing previously. She also heard Tarver say that he had the black leather jacket, gold chain, and money, and the defendant say that he had the "weed." Thereafter, Tarver and the defendant began arguing with each other about "who gets what" from the items. At some point, Collazo dropped off McNeil at a local Stamford bodega; picked up her brother, Elvis Batista; picked up her son from an after-school program in Stamford; and proceeded to drive everyone back to her and Batista's apartment in Bridgeport.

During the drive, Tarver told Batista, "We just robbed Pun." Also during the drive, near a Norwalk exit on

Interstate 95, the defendant threw the victim's cell phone out of the car window. Upon arriving back home in Bridgeport at about 7 p.m., Collazo turned on the news on television and saw that a shooting had occurred on Stillwater Avenue in Stamford, which gave her a "bad feeling." The next morning, she woke up in her apartment and smelled the scent of marijuana in the air, saw the black leather jacket Tarver had been wearing in the car the previous night, and noticed that the defendant and Tarver were still in the apartment. On December 13, 2010, the defendant was arrested pursuant to a warrant.

Prior to trial, the state filed a second amended information dated May 7, 2014, charging the defendant with one count of felony murder in violation of § 53a-54c, one count of robbery in the first degree in violation of § 53a-134 (a) (2), and one count of conspiracy to commit robbery in the second degree in violation of §§ 53a-48 (a) and 53a-135. Following a jury trial, the defendant was found guilty of all counts. He was sentenced to a total effective term of fifty-five years imprisonment followed by five years of special parole. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the court improperly admitted two hearsay statements made by Tarver.[2] The first, he made to Johnson approximately one week before the robbery and shooting of the victim. The second, he made to Batista immediately after the robbery and shooting of the victim. The defendant specifically argues, inter alia, that neither statement should have been admitted under § 8-6 (4) of the Connecticut Code of Evidence, entitled "Statement against penal interest," because the first statement to Johnson would not have subjected Tarver to any criminal liability, and the second statement to Batista is not sufficiently trustworthy because the two parties did not share a preexisting relationship with each other.

In response, the state first argues that the hearsay statement to Johnson was properly admitted as a statement against penal interest because it is inculpatory pursuant to the holding of *State* v. *Bryant*, 202 Conn. 676, 689–702, 523 A.2d 451 (1987).[3] The state next argues that the hearsay statement to Batista was properly admitted as a statement against penal interest[4] because the evidence suggested more than a mere acquaintanceship between the two parties, and the factors that inform the court's determination regarding the statement's trustworthiness weigh in favor of its reliability. We agree with the state that both statements were properly admitted as statements against penal interest.

Before addressing the merits of these claims, we set forth the applicable standard of review and the law

governing the hearsay exception for statements against penal interest. "To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Miguel C.*, 305 Conn. 562, 571–72, 46 A.3d 126 (2012).

"As a general matter, hearsay statements may not be admitted into evidence unless they fall within a recognized exception to the hearsay rule." *State* v. *Smith*, 289 Conn. 598, 618, 960 A.2d 993 (2008). Section 8-6 of the Connecticut Code of Evidence provides in relevant part that "[t]he following are not excluded by the hearsay rule if the declarant is unavailable as a witness . . . (4) Statement against penal interest. A trustworthy statement against penal interest that, at the time of its making, so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. In determining the trustworthiness of a statement against penal interest, the court shall consider (A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest . . . ." In short, the admissibility of a hearsay statement pursuant to § 8-6 (4) of the Connecticut Code of Evidence "is subject to a binary inquiry: (1) whether [the] statement . . . was against [the declarant's] penal interest and, if so, (2) whether the statement was sufficiently trustworthy." *State* v. *Collins*, 147 Conn. App. 584, 590, 82 A.3d 1208, cert. denied, 311 Conn. 929, 86 A.3d 1057 (2014).

A

We turn first to the defendant's claim that the court improperly admitted as a statement against penal interest the hearsay declaration that Tarver made to Johnson—that he was going to set up "Pun" to be robbed—seven days prior to the robbery and shooting of the victim. The defendant argues that the statement does not qualify as one against penal interest because the statement alone would not have subjected Tarver to any criminal liability, given that Tarver was merely "sharing an unformed idea for the future with his friend." In response, the state argues that there is no requirement that such statements must, by themselves, subject the declarant to arrest, because the exception applies equally to statements which "tend" to incriminate the declarant were he or she charged with a crime, as made clear by our Supreme Court's decision in *State*

v. *Bryant*, supra, 202 Conn. 695–96. We agree with the state.

With respect to what it means for a statement to be "against penal interest," our Supreme Court held in *State* v. *Bryant*, supra, 202 Conn. 695–96, that it was persuaded by "the trend to reject a narrow and inflexible definition of a statement against penal interest in favor of a definition which includes not only confessions, but other remarks [that] would tend to incriminate the declarant were he or she the individual charged with the crime. . . . The against interest exception is not limited to a defendant's direct confession of guilt. . . . It applies as well to statements that tend to subject the speaker to criminal liability. . . . The rule encompasses disserving statements by a declarant that would have probative value in a trial against the declarant. . . . Considered in context, the term tend . . . reaches in a proper case as against interest remarks that strengthen the impression that the declarant had an insider's knowledge of the crimes. . . . As to what is against penal interest, quite obviously the essential characteristic is the exposure to risk of punishment for a crime. . . . Moreover, it is not the fact that the declaration is against interest but the awareness of that fact by the declarant [that] gives the statement significance." (Citations omitted; internal quotation marks omitted.) Id.

In *Bryant*, the court was tasked, in part, with reviewing whether a hearsay statement, offered by the defendant, that the defendant's brother, Eugene Bryant, made to a witness, Keith Perry, *before* the burglary at issue occurred was properly excluded by the trial court because it failed to fall within the hearsay exception for statements against penal interest. Id., 691–95. Before the burglary in that case took place on September 8, 1983, Bryant asked Perry toward the end of summer if he wanted to break into an apartment on Dell Avenue in New London. Id., 690. Our Supreme Court held that the statement was "in a very real sense self-incriminatory and unquestionably against interest" because "the context in which [Bryant] had made the statements concerning the burglary . . . fairly viewed, indicates that he had an insider's knowledge of the crimes and implied his personal participation." (Internal quotation marks omitted.) Id., 696.

In the present case, therefore, we disagree with the defendant's assertion that the statement could not be considered against Tarver's penal interest because, at the time it was made, it could not subject him to immediate criminal liability. If the only requirement for constituting "against penal interest" were that such statements must, by themselves, subject the declarant to immediate criminal liability, then any statement made *before* the commission of a crime could never constitute a statement against interest, a conclusion

that contravenes our Supreme Court's holding in *Bryant*.

By explicitly stating to Johnson that he intended to rob the victim during a feigned drug transaction by calling in an order of "ten bags of weed," Tarver certainly "*tend*[*ed*] to subject [himself] to criminal liability" in that the statement "would have probative value in a trial against the declarant."[5] (Emphasis added; internal quotation marks omitted.) *State* v. *Bryant*, supra, 202 Conn. 695–96. Ultimately, Tarver's statement here, like Bryant's statement to Perry in *Bryant*, indicates that the declarant intended in the future to participate personally in a robbery of the victim.[6] The trustworthiness of that statement is strongly bolstered by the fact that such a robbery subsequently occurred just seven days after the statement was made.

To the extent that the defendant argues that the court cannot rely on evidence of a "subsequently committed crime" in its evaluation of "the existence of corroborating evidence in the case"; Conn. Code Evid. § 8-6 (4) (B); we disagree. In fact, in *Bryant*, our Supreme Court specifically looked to evidence of the subsequently committed robbery in evaluating the existence of corroborating evidence bolstering the trustworthiness of the statement against penal interest. The court stated that "[Bryant's] earlier importuning of Perry, evidencing his predisposition to commit the crime, is also not without significance, given the actual burglary of the apartment on Dell Avenue." *State* v. *Bryant*, supra, 202 Conn. 698. "It is evident that there was significant evidence of the corroborative quality required." Id., 701.

The defendant cites to both *Idaho* v. *Wright*, 497 U.S. 805, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990), and *State* v. *Merriam*, 264 Conn. 617, 835 A.2d 895 (2003), in support of his assertion that "evidence not directly related to the circumstances surrounding the making of the statement cannot be used to substantiate the statement's trustworthiness." Id., 644. Those cases are inapplicable here.

In both cases, the nature of the defendant's claim was that the admission of the out-of-court statement violated his rights under the confrontation clause. See id., 642; see also *Idaho* v. *Wright*, supra, 497 U.S. 822–23. Accordingly, both cases analyzed the defendant's claim pursuant to the applicable legal framework at that time set forth in *Ohio* v. *Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), which provided that "once a witness is shown to be unavailable, his statement is admissible only if it bears adequate indicia of reliability . . . [and] the evidence must be excluded . . . absent a showing of *particularized* guarantees of trustworthiness." (Emphasis added; internal quotation marks omitted.) *Idaho* v. *Wright*, supra, 814–15. This test, however, requiring "particularized guarantees of trustworthiness," is more rigorous than the requirement set forth

in § 8-6 (4) of the Connecticut Code of Evidence, that is, that the statement simply be "trustworthy."[7] In addition, the test set forth in *Roberts* was abrogated later by *Crawford* v. *Washington*, 541 U.S. 36, 51–53, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The defendant here does not allege a constitutional claim under the confrontation clause, nor could he succeed in doing so, given that the hearsay statement here was not "testimonial" in nature. See id. Accordingly, the defendant's reliance upon *Wright* and *Merriam* is unavailing.

For all of these reasons, we conclude that Tarver's declaration to Johnson was against his penal interest. Accordingly, the court did not abuse its discretion in admitting it pursuant to the hearsay exception set forth in § 8-6 (4) of the Connecticut Code of Evidence.

B

We next turn to the defendant's claim that the court improperly admitted as a statement against penal interest the hearsay declaration that Tarver made to Batista—"we just robbed Pun"—in Collazo's car immediately following the robbery and shooting of the victim. The defendant specifically argues that the court abused its discretion in admitting the statement because it was not trustworthy in light of the fact that there was not a preexisting relationship of "special trust" between the declarant and the listener. In response, the state argues that the evidence suggested more than a mere acquaintanceship between the two parties, and the factors that speak to a statement's trustworthiness, as set forth in § 8-6 (4) (A) through (C) of the Connecticut Code of Evidence, weigh in favor of its reliability. We conclude that the court, after weighing the relevant factors that bear upon the trustworthiness of Tarver's statement to Batista, did not abuse its discretion in admitting the statement.

As previously noted, § 8-6 (4) of the Connecticut Code of Evidence sets forth three factors a court shall consider in determining a statement's trustworthiness: "(A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest." "[T]he trial court must carefully weigh all of the relevant factors in determining whether the statement bears sufficient indicia of reliability to warrant its admission." (Internal quotation marks omitted.) *State* v. *Camacho*, 282 Conn. 328, 363, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007). Accordingly, "[n]o single factor for determining trustworthiness . . . is necessarily conclusive." (Internal quotation marks omitted.) *State* v. *Bryant*, supra, 202 Conn. 694. We review for an abuse of discretion the court's determination that the statement was trustworthy and, thus, admissible at trial. See *State* v. *Miguel C.*, supra, 305 Conn. 571–72.

Beginning with the third factor, we conclude that Tarver's statement to Batista was against his penal interest to a significant extent and, thus, weighs heavily in support of its admissibility. He directly and explicitly incriminated himself by admitting his own participation in the crime. In other words, "there is nothing to suggest that [Tarver] was attempting to . . . minimize his own criminal involvement." *State* v. *Pierre*, 277 Conn. 42, 69, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006).

With regard to the second factor, we conclude that there was an abundance of other evidence corroborating the trustworthiness of Tarver's statement. As previously discussed, seven days before the robbery and shooting of the victim, Tarver told his friend, Johnson, that he intended to rob the victim in a scheme involving a phony drug deal. Moreover, Collazo testified that the defendant asked her to give the men a ride to Stillwater Avenue on the evening of November 4, 2009, for the purpose of buying drugs, a request with which Collazo complied. Furthermore, telephone records presented at trial showed that Tarver called the victim right before the victim was found robbed and shot. In addition, within seconds before the shooting, the defendant and Tarver were seen heading toward the victim's house, as attested to by Patterson, and, within seconds after the shooting, the men ran back to Collazo's car, at which point the defendant urgently directed Collazo "to hurry up and leave." There was also evidence that, while in Collazo's car, Tarver and the defendant were in possession of the victim's black leather jacket, gold chain, marijuana, and money, and that the two men were arguing over "who gets what."

With regard to the remaining factor for trustworthiness set forth in § 8-6 (4) of the Connecticut Code of Evidence, we conclude that the circumstances under which Tarver made his statement to Batista were strongly indicative of its reliability. "In general, declarations made soon after the crime suggest more reliability than those made after a lapse of time where a declarant has a more ample opportunity for reflection and contrivance." (Internal quotation marks omitted.) *State* v. *Pierre*, supra, 277 Conn. 70. Here, the robbery and shooting of the victim occurred sometime near 6 p.m., and Tarver, McNeil, and the defendant all got back into Collazo's car immediately after Collazo heard the gunshots. At that point, Collazo dropped McNeil off a short distance away and picked up Batista.

Collazo testified that she made it back to Bridgeport at about 7 p.m. Accordingly, the statement that Tarver made to Batista took place within one hour after the crime, "thus suggesting that the details of each individual's participation in the incident were still fresh in [Tarver's] mind." Id., 71. Moreover, Tarver's statement appears to be "spontaneous and unsolicited"; *State* v.

*Bryant*, supra, 202 Conn. 698; therefore making it more reliable.

The defendant maintains that the statement is not sufficiently trustworthy because Tarver and Batista did not share a close relationship with each other such that Tarver would have naturally confided in Batista about the defendant and Tarver having "just robbed Pun." There was evidence, however, that Tarver, along with the defendant, stayed the night at Batista's apartment in Bridgeport immediately after the crime occurred, suggesting a greater degree of acquaintanceship between the two men. Such a relationship between declarant and listener is one that our Supreme Court tacitly has approved as supporting the reliability of a statement against penal interest. See *State* v. *Bryant*, supra, 202 Conn. 699, quoting *Chambers* v. *Mississippi*, 410 U.S. 284, 300, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) ("assurances of reliability were found in the circumstance that the defendant's confessions were made 'spontaneously to a close *acquaintance* shortly after the [crime] had occurred' " [emphasis added]). We also note that although the record does not establish the nature and extent of Tarver's and Batista's relationship,[8] the statement certainly was made outside "the coercive atmosphere of official interrogation," which our Supreme Court has held makes it "more trustworthy than statements obtained by government agents for the purpose of creating evidence that would be useful at a future trial." (Internal quotation marks omitted.) *State* v. *Pierre*, supra, 277 Conn. 69–70.

Even if we were to assume, however, that Tarver and Batista did not have a significant preexisting relationship with each other at the time the statement was made, it bears repeating that "[n]o single factor for determining trustworthiness . . . is necessarily conclusive." (Internal quotation marks omitted.) *State* v. *Bryant*, supra, 202 Conn. 694. Rather, the trial court is tasked with weighing all of the relevant factors set forth in § 8-6 (4) of the Connecticut Code of Evidence. *State* v. *Camacho*, supra, 282 Conn. 363. Thus, to the extent that this consideration does not cut in favor of the statement's reliability, it does not necessarily trump the significance of the other factors that weigh in favor of its trustworthiness. Accordingly, we conclude that the court did not abuse its discretion in admitting the statement against penal interest made by Tarver to Batista.

II

The defendant next claims that the trial court improperly admitted a written statement given to the police by Alexis Farrow because that statement itself contained evidence of an insufficiently authenticated telephone call between the defendant and Farrow, during which the defendant made an inculpatory statement.[9] Specifically, the defendant argues that Farrow's written statement should not have been admitted because (1) the

statement to the police did not contain sufficient evidence that Farrow knew to whom she was talking on the telephone, and (2) Farrow subsequently recanted at trial her account of the telephone conversation.

In response, the state argues that Farrow's written statement set forth sufficient facts to authenticate the underlying telephone call and that, because the written statement was admitted into evidence for substantive purposes pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 1075 S. Ct. 597, 93 L. Ed. 2d 598 (1986), the court could credit it for purposes of deciding that the telephone call was sufficiently authenticated. We agree with the state.

The following facts and procedural history are relevant to this claim. On the day after the robbery and shooting of the victim, Farrow and her friend, Jeriya Hargrove, called the victim's cell phone multiple times to see if someone would answer because they believed his cell phone had gone missing after the shooting. No one picked up, and the call went to voice mail. The women then decided to call simultaneously the cell phone of the defendant, to whom they referred by his nickname, "Pretty D," and the cell phone of the victim, to see if the victim's cell phone would ring in the background of the call with the defendant. The defendant answered in a feigned feminine tone and said, "Hello, who is this?" to which the women responded, "Who is this?" After going back and forth like this several times, the women hung up the telephone. Shortly thereafter, they called the defendant's cell phone again, and he responded in his normal voice. Farrow repeatedly asked the defendant, "Where's Pun?" and the defendant repeatedly asked, "Who is this?" The defendant, thereafter, hung up the telephone. After waiting thirty seconds, the women called the defendant's cell phone one last time, and the defendant answered and said, "Yeah, I killed Pun, you stupid bitch," before hanging up on them again.

The next day, on November 6, 2009, Farrow went to the Stamford Police Department. She gave a sworn written statement recounting these events and picked the defendant out of a photographic array, identifying him as "the person who spoke to me on the telephone." In her statement to the police, Farrow attested: "I know the person answering the telephone was Pretty D because I know his voice very well, and I have known him for five years."

At the defendant's trial, Farrow testified that she did not want to be in court, she had not known the defendant for five years, she could not be sure that the person on the telephone that day was the defendant, she did not say anything to the person on the telephone, and she could not be sure what the person on the telephone was saying because the voice sounded muffled. In light of this recantation, the state offered and the court

admitted into evidence for substantive purposes Farrow's previous November 6, 2009 statement to the police pursuant to *State* v. *Whelan,* supra, 200 Conn. 753.

"In *State* v. *Whelan,* supra, 200 Conn. 753 . . . we adopted a hearsay exception allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination. This rule has also been codified in § 8-5 (1) of the Connecticut Code of Evidence . . . . The *Whelan* hearsay exception applies to a relatively narrow category of prior inconsistent statements . . . [and was] carefully limited . . . to those prior statements that carry such substantial indicia of reliability as to warrant their substantive admissibility. As with any statement that is admitted into evidence under a hearsay exception, a statement that satisfies the *Whelan* criteria may or may not be true in fact. But, as with any other statement that qualifies under a hearsay exception, it nevertheless is admissible to establish the truth of the matter asserted because it falls within a class of hearsay evidence that has been deemed sufficiently trustworthy to merit such treatment. Thus . . . we allow the fact finder to determine whether the hearsay statement is credible upon consideration of all the relevant circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Simpson,* 286 Conn. 634, 641–43, 945 A.2d 449 (2008).

The defendant on appeal does not assert that the court improperly admitted Farrow's written statement as substantive evidence at trial. Instead, the defendant's claim is limited to an assertion that the written statement did not contain sufficient evidence to authenticate the underlying telephone call, particularly in light of the recantation of the salient facts with respect to that telephone call.

We now turn to the question of whether the court had sufficient facts before it to support its implicit finding that the telephone call had been sufficiently authenticated. The Connecticut Code of Evidence provides that "[t]he requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be." Conn. Code Evid. § 9-1 (a). "Similar to writings, authentication is a necessary preliminary to the introduction of telephone communications. . . . There need only be a prima facie showing of the telephone conversation to the court and then, as long as it is otherwise admissible, the evidence goes to the jury, which will ultimately determine its authenticity. . . . The proffering party must demonstrate to the trial court that there is substantial evidence from which the jury could infer that the telephone communication was authentic. . . . Telephone conversations may be authenticated by circumstantial evidence,

if the party calling, in addition to stating his identity, relates facts and circumstances that, taken with other established facts, tend to reveal his identity. . . . The requisite . . . proof may take the form of testimony by the witness that he is familiar with X's voice and that the caller was X." (Citations omitted; internal quotation marks omitted.) *State* v. *Valentine*, 255 Conn. 61, 77–78, 762 A.2d 1278 (2000). Such identifications "are admissible if the identifying witness is minimally familiar with the voice he identifies. . . . Once the minimal showing has been made, the jury determines the weight to accord to the identification testimony." (Internal quotation marks omitted.) *State* v. *Kerr*, 120 Conn. App. 203, 224, 991 A.2d 605, cert. denied, 296 Conn. 907, 992 A.2d 1136 (2010).

In the present case, we do not find persuasive the defendant's argument that the out-of-court confession[10]—"I killed Pun, you stupid bitch"—that he allegedly made to Farrow over the telephone was improperly admitted because it was not sufficiently authenticated. In Farrow's statement to the police, the entirety of which was introduced into evidence as proof of the facts contained therein, she explicitly attested that she "[knew] the person answering the telephone was Pretty D because [she knows] his voice very well, and [she has] known him for five years." As this court held in *Kerr*, the requirement for authenticating such a communication is to make a mere *minimal* showing. *State* v. *Kerr*, supra, 120 Conn. App. 224. In this case, the evidence of these facts was contained in the sworn statement by Farrow that she was familiar with the defendant's voice and that the person on the other end of the line was the defendant. See *State* v. *Valentine*, supra, 255 Conn. 78. This is precisely what occurred here. Moreover, the defendant provides no support for his assertion that the witness must provide more details than a "naked conclusion" that she is familiar with the defendant's voice, and we decline to impose such an additional requirement.

With regard to the defendant's argument that the telephone conversation was not properly authenticated because Farrow recanted much of her previous statement to the police, such a contention is irrelevant to our present analysis because the written statement was admitted pursuant to *Whelan*. As previously stated, under *Whelan*, although the prior written inconsistent statement "may or may not be true in fact," it nevertheless may be admitted to establish the truth of the matter asserted, at which point "we allow the fact finder to determine whether the hearsay statement is credible upon consideration of all the relevant circumstances." (Internal quotation marks omitted.) *State* v. *Simpson*, supra, 286 Conn. 642–43. The court, therefore, had conflicting evidence of the critical facts that bear upon the question of whether there had been a sufficient showing of authentication regarding the telephone conversation.

Although the court did not make any particular findings regarding facts, we presume on this record that the court chose to credit the evidence contained in the written statement that Farrow was familiar with the defendant's voice and knew it was the defendant on the telephone call, and it did not credit her recantation of those facts. See Conn. Code Evid. § 1-3 (a) ("preliminary questions concerning . . . the admissibility of evidence shall be determined by the court").

Because, as stated previously, we conclude that Farrow's written statement concerning the telephone call with the defendant met the minimal authentication standards required by § 9-1 (a) of the Connecticut Code of Evidence, we conclude that the court did not abuse its discretion in admitting it.

### III

The defendant's final claim on appeal is that the court improperly denied his request to instruct the jury on the affirmative defense to felony murder contained in § 53a-54c, which provides in relevant part: "[I]n any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

Specifically, the defendant argues that the court should have given the requested charge because there was sufficient evidence from which the jury could conclude that he did not commit or otherwise contribute to the homicidal act, he did not have a weapon on him, he did not expect Tarver to be armed, and he did not have a reasonable ground to believe that Tarver intended to rob or otherwise harm the victim. In response, the state argues that the court properly declined to give the charge because there was insufficient evidence from which the jury reasonably could find the existence of each of the four elements of § 53-54c by a preponderance of the evidence. We agree with the state.

The following facts and procedural history are relevant to our review of this claim. Prior to the court finalizing its jury instructions, the defendant filed a request to charge on the affirmative defense to felony murder as set forth in § 53a-54c, and the parties discussed the matter with the court during a charge conference on May 28, 2014. The defendant essentially rested his affirmative defense on the theory that he only

intended to purchase "weed" from the victim on the evening in question and that, unbeknownst to him, Tarver alone planned and carried out the robbery and shooting. During the charge conference, the defendant emphasized the fact that he did not need to produce the evidence himself in order to be entitled to an instruction, and he proceeded to point to various pieces of evidence that were admitted during the state's presentation of its case in support of his contention that there was sufficient proof for a reasonable juror to find that all of the elements of § 53a-54c had been satisfied, including the following: testimony from Johnson reflecting Tarver's intent to rob the victim, testimony from Collazo that Tarver stated to Batista immediately after the shooting that he had robbed the victim, testimony from Collazo indicating that she did not observe the defendant armed that day, and testimony from Collazo indicating the defendant's surprised reaction immediately after the shooting.[11]

The state argued, in turn, that although the case law does not require that evidence necessary to satisfy the elements of the affirmative defense be offered by the defendant, it does require that "there be evidence from some person. There wasn't a third person there who basically said . . . I was there and I watched [the defendant]; and I was with [the defendant] and Mr. Tarver all morning, and they never talked about anything. This is hypothetical. That would be evidence. In some of these cases, there was evidence . . . on one of the prongs where a witness said that the shooter was another person. So, while it is true that there doesn't have to be testimony by the defendant . . . it's not true . . . that basically just surmising one plausible interpretation of the evidence and basically inferring into the rest of it that that [rises] to the level of having evidence by a preponderance of the evidence to request this affirmative defense."

The following exchange then took place between the court and defense counsel:

"The Court: . . . Let's just say I were to credit [the defendant's] argument about element two [being satisfied] because Miss Collazo, I think, did say [that she did not see the defendant with a weapon].

"Although I don't know how in the world she would know—really know that. But she said that the defendant didn't have a gun or wasn't armed.

"But in terms of [element] one, did not participate in a homicidal act. The first element is, the defendant did not commit a homicidal act or in any way solicit, request, command, importune and cause or aid in the commission of the act.

"You cite Tarver's statement to Shari Johnson that he's going to—he wants to rob Pun. That doesn't say anything about who did the homicidal act.

"Even if everyone believes, the jury believes that Mr. Tarver planned to rob [the victim] and did rob [the victim], that doesn't mean that Mr. Tarver pulled the trigger, so to speak. . . .

"[Defense Counsel]: . . . [I]t's not just Mr. Tarver's actions. It's also [the defendant's] action. If you look at the two together, Mr. Tarver planned the robbery. [The defendant] plans to buy weed.

"Mr. Tarver after the robbery discusses how—tells people, I robbed Pun and goes over the list of the things he has, and he has the jacket on him. [The defendant] acts with outrage and surprise and says, you know, what the 'F.' . . .

"The Court: . . . I'll just say this. I'm not convinced.

"From what I heard, basically, your argument, I don't think that there's sufficient evidence to even go to the jury on the first count that the defendant didn't do the homicidal act.

"And even, as I said, crediting your argument regarding element two—and I really don't, but just for argument's sake, you go on[to] element three, the defendant did not believe any other participant was armed. I don't really see any evidence to indicate that.

"And it's the defense that has to go forward on this, and I don't see the evidence regarding element four— did not believe any other participant was likely to commit a homicidal act. And I agree with you that the defendant doesn't have to get up on the witness stand and say that, but there's got to be some evidence on that.

"So, I don't really think there's sufficient evidence for the affirmative defense to go to the jury . . . ."

The following legal principles guide our review of this claim. "If there is sufficient evidence of a legal defense, the defendant is entitled, as a matter of law, to a requested jury charge on that defense. . . . Because the defendant bears the burden of proof of an affirmative defense . . . a defendant is entitled to a requested instruction on the affirmative defense [to felony murder as set forth in § 53a-54c] only if there is sufficient evidence for a rational juror to find that all the elements of the defense are established by a preponderance of the evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Person*, 236 Conn. 342, 352–53, 673 A.2d 463 (1996).

We note that, in his brief, the defendant argues that " 'a defendant is entitled to [an] [instruction] on a defense for which there is evidence produced at trial to justify the instruction, *no matter how weak or incredible the claim*.' " (Emphasis added.) This contention is incorrect in the context of this case, however, as that standard applies only to general defenses, not affirmative defenses such as the one set forth in § 53a-54c. See

*State* v. *Person*, supra, 236 Conn. 352–53 ("It is well established in Connecticut that a defendant is entitled to have the jury instructed on any general defense for which there is any foundation in the evidence, no matter how weak or incredible. . . . This standard is appropriate when a defendant raises a general defense and the state has the burden of disproving that defense beyond a reasonable doubt. . . . The any evidence standard has been improperly applied, however, to affirmative defenses. . . . To the extent that those cases have held that any evidence is sufficient for a defendant to be entitled to a requested instruction regarding an affirmative defense, they are overruled." [Citations omitted; internal quotation marks omitted.])

In the present case, the court properly declined to charge the jury on the affirmative defense because the defendant did not meet his burden of presenting sufficient evidence from which the jury could rationally conclude that he had proved by a fair preponderance the existence of each of the four elements set forth in § 53a-54c. With respect to the first element, there is simply no evidence in the record that the defendant did not commit the shooting or in any way solicit, request, command, importune, cause, or aid the commission thereof. Although the defendant was free to argue, as he did, that he was not the shooter and that he was merely an innocent bystander to the crimes committed by Tarver, such an assertion functions as a challenge to the state's burden of proving its case beyond a reasonable doubt—it does not constitute affirmative evidence that the defendant was not the shooter.

After reviewing the record, we are unable to find any evidence presented as to the identity of the actual shooter, presumably because no one testified as an eyewitness to the shooting, with the exception of Farrow's statement that quoted the defendant as saying that he killed "Pun." Thus, the only affirmative evidence in the record as to the identity of the shooter inculpates the defendant, not Tarver. Moreover, as the trial court aptly noted, "[e]ven if . . . the jury believes that Mr. Tarver planned to rob [the victim] and did rob [the victim], that doesn't mean that Mr. Tarver pulled the trigger, so to speak." In other words, the jury was not obligated to decide that only one of the two men— Tarver or the defendant—carried out the robbery and shooting; it reasonably could have found that both men were involved in the commission of the offenses and were working with each other to a common end. For these reasons, we cannot conclude that the defendant provided sufficient evidence for a "rational juror to find that [the defendant did not commit or aid in the homicidal act] by a preponderance of the evidence." *State* v. *Small*, 242 Conn. 93, 102, 700 A.2d 617 (1997).

Furthermore, even if we were to assume that there was sufficient evidence for the defendant to carry his

burden on the second element—that the defendant was not armed with a gun—we cannot conclude that the defendant carried his burden with regard to the two remaining elements of § 53a-54c. As previously discussed in the context of the first element, we conclude that the defendant's arguments with respect to the remaining elements also operate as mere challenges to the state's burden of proving its case and that such arguments cannot be used as a substitute for affirmative evidence. In sum, there was simply no evidence presented that the defendant "had no reasonable ground to believe that [Tarver] was armed"—element three— or that the defendant "had no reasonable ground to believe that [Tarver] intended to engage in conduct likely to result in death or serious physical injury"— element four. See General Statutes § 53a-54c.

Finally, we note that although the defendant certainly was not required to take the witness stand and testify on his own behalf, we agree with the state's assessment in its brief that "appellate cases that have found sufficient evidence on the statutory elements of § 53a-54c have generally relied on the defendant's own testimony to establish those elements . . . [thereby underscoring] that it is the defendant who carries the burden of presenting evidence when asserting an affirmative defense." (Citations omitted.) See, e.g., *State* v. *Small*, supra, 242 Conn. 103; *State* v. *Bond*, 201 Conn. 34, 37, 513 A.2d 95 (1986); *State* v. *Vitale*, 197 Conn. 396, 400– 401, 497 A.2d 956 (1985).

Because the defendant has failed to demonstrate that there was sufficient evidence before the jury to establish by a fair preponderance that all elements of the defense were met, the defendant cannot succeed on this claim because the affirmative defense set forth in § 53a-54c is established only if all four elements are proven. See *State* v. *Person,* supra, 236 Conn. 353. Accordingly, we conclude that the court properly declined the defendant's request to charge the jury on the affirmative defense to felony murder.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] We note that although § 53a-54c has been amended since the date of the events at issue, that amendment is not relevant to this appeal. For convenience, we refer to the current revision of § 53a-54c.

[2] The state filed a motion in limine setting forth its arguments as to why these statements, and other evidence, should be admitted. The defendant subsequently filed an objection to the state's motion in limine. We note that we were not provided a transcript of the court's actual ruling on the motion, to the extent that it was on the record. We also note that the written motion in limine in the case file does not contain a signed order by the court. The parties, however, do not appear to dispute that the court granted the motion, and the court, on at least one occasion, implied that it had made a prior ruling in the state's favor on the motion in limine, at one point stating to defense counsel: "Even if you claim [Collazo] said something inconsistent, it doesn't affect my prior ruling. We had a motion in limine. I heard an offer of proof. I heard your arguments. You submitted briefs to me. I read them. I heard the state's arguments. I read the state's brief. That's why we did all this ahead of time."

The state nevertheless argues that because the defendant has not provided this court with the trial court's ruling on the challenged statements, the record is inadequate for review. We disagree. Because the parties' positions on the admissibility of these hearsay statements were sufficiently set forth in their memoranda in support of, and in opposition to, the motion in limine, the record is otherwise adequate for review. To the extent the trial court was required to make preliminary factual determinations in deciding to admit evidence; see Conn. Code Evid. § 1-3 (a); we construe the factual record to support rather than undermine the court's decision to admit the evidence. *State* v. *Camacho*, 282 Conn. 328, 354, 924 A.2d 99 ("the evidence will be construed in a way most favorable to sustaining the preliminary determinations of the trial court" [internal quotation marks omitted]), cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007). Moreover, because we decide these claims adversely to the defendant, the state is not prejudiced by our consideration of them. See *State* v. *Gaines*, 257 Conn. 695, 713 n.13, 778 A.2d 919 (2001).

[3] The state also argues, in the alternative, that Tarver's statement to Johnson was properly admitted pursuant to § 8-3 (4) of the Connecticut Code of Evidence, entitled "Statement of then-existing mental or emotional condition." Because our conclusion that the statement was properly admitted as a statement against penal interest is dispositive of this claim, we need not address the state's alternative ground.

[4] In the state's motion in limine before the trial court, it argued that Tarver's hearsay statement to Batista should alternatively be admitted pursuant to other hearsay exceptions. See Conn. Code Evid. § 8-3 (1) (D). Because our conclusion that the statement was properly admitted as a statement against penal interest is dispositive of this claim, we need not address those alternative grounds for admissibility.

[5] Indeed, a trial against Tarver did eventually take place, leading to his conviction of robbery, among other offenses. See *State* v. *Tarver*, 166 Conn. App. 304, 306, 141 A.3d 940, cert. denied, 323 Conn. 908, 150 A.3d 683 (2016).

[6] In deciding to admit the statement, the trial court was free to reject, as a factual matter, the defendant's assertion that Tarver was just "talking and acting tough."

[7] As previously discussed, the court in *Bryant* assessed the trustworthiness of a hearsay statement against penal interest by reference to the subsequently committed crime. *State* v. *Bryant*, supra, 202 Conn. 698–701. If we were evaluating its trustworthiness under the standard set forth in *Ohio* v. *Roberts*, supra, 448 U.S. 56, however, a reference to the subsequently committed crime presumably would not pass muster because "evidence not directly related to the circumstances surrounding the making of the statement cannot be used to substantiate the statement's trustworthiness." *State* v. *Merriam*, supra, 264 Conn. 644.

[8] When Batista testified briefly as a witness at trial, he denied that Tarver and/or the defendant were ever in the car with himself, Collazo, and Collazo's son on the evening in question.

[9] In the defendant's objection to the state's motion in limine, he argued that Farrow's written statement describing the defendant's alleged inculpatory statement should not be admitted unless or until the telephone conversation referenced by Farrow is properly authenticated by the court. As previously discussed in footnote 2 of this opinion, we were not provided a transcript of the court's actual ruling on the motion in limine, to the extent that it was on the record, and the motion does not contain a signed order by the court, although the record does seem to indicate that the court ruled in the state's favor on the motion. In addition, during trial, defense counsel did object to the admission of Farrow's written statement on authentication grounds, although his precise argument is unclear from the colloquy. That objection was overruled. For these reasons, and the fact that the state is not prejudiced by our consideration of it; see *State* v. *Gaines*, 257 Conn. 695, 713 n.13, 778 A.2d 919 (2001); we review this claim.

[10] Pursuant to § 8-3 (1) of the Connecticut Code of Evidence, a statement by a party opponent is admissible as an exception to the rule against hearsay. The defendant does *not* challenge the admissibility of the alleged statement on the ground that it does not fit within this hearsay exception.

[11] The surprised reaction to which the defendant referred came out during cross-examination of Collazo, when the following exchange took place between defense counsel and Collazo:

"Q. . . . And when [the defendant] got in the car, isn't the first thing he said is, what the fuck? Isn't that what he said? Do you remember that?

"A. Not that I can recall, no.

"Q. If I showed you—let me see if this refreshes your recollection. . . .

"Q. Did you take a look at that [statement you had given to the police], ma'am?

"A. Uh-huh.

"Q. Okay. And you didn't tell the police he said, what the fuck, didn't you tell them that?

"A. It seems so.

"Q. Right. Is that a yes?

"A. Yes.

"Q. Okay. And that's the first thing he said, right?

"A. I couldn't recall—I can't recall [the] chronological order of what was said.

"Q. And he didn't say that to you, did he?

"A. No.

"Q. He said it to Mr. Tarver, didn't he?

"A. I—I guess that's safe to assume. He wasn't talking to me."